# APPENDIX A

(Rev. 01-31-2003)

# FEDERAL BUREAU OF INVESTIGATION

**Precedence:** ROUTINE                    **Date:** 06/20/2003

**To:** Laboratory                **Attn:** 
                                    Latent Print Unit,
                                    Extension: 1952

**From:** Baltimore
        Squad 5
        **Contact:** SA 

**Approved By:** Ward Gary M

**Drafted By:**                      glwm        030623001        b6
                                                                 b7C

**Case ID #:** 52B-BA-102647    (Pending)

**Title:** UNSUB(S);
        THEFT OF $36,750.00 U.S. CURRENCY
        IN EVIDENCE AT THE
        U. S. DISTRICT COURTHOUSE,
        101 WEST LOMBARD STREET,
        BALTIMORE, MARYLAND;
        09/23/2002 TO 09/26/2002;
        TGP;
        OO: BALTIMORE

**Synopsis:** FBIHQ, Laboratory Services Division, is requested to examine the internal K-Pak, captioned case evidence item 1B4, bar code E1591937 and develop latent fingerprints of value.

**Administrative:** Reference acknowledgment letter dated January 28, 2003 from                      Latent Print Unit, to SSA                      Squad 20, Baltimore Division.

**Enclosure(s):** Enclosed for the Laboratory, Latent Print Unit is one heat sealable K-Pak containing $1,058.00 and a previously opened K-Pak. Item is 1B4 in Baltimore case 91A-BA-100604, bar code number E01975427. The second and previously opened K-Pak has bar code number E1591937.

**Details:** Referenced letter advises enclosed K-Pak, bar code number E01975427, was previously examined for latent prints. At the time of submission for examination the external K-Pak did not have a barcode attached. Subsequently, bar code E01975427 was attached to the K-Pak by Baltimore evidence Technicians. Baltimore is requesting that latent prints of value be developed

To:  Laboratory  From:  Baltimore
Re:  52B-BA-102647, 06/20/2003


on the internal K-Pak, bar code number E1591937.  This K-Pak was
in a position to collect finger prints of value.

030623001

2

To:  Laboratory  From:  Baltimore
Re:  52B-BA-102647, 06/20/2003


**LEAD(s):**

**Set Lead 1:   (Action)**

    <u>LABORATORY</u>

       <u>AT WASHINGTON, DC</u>

       Latent Fingerprint Unit is requested to develop latent
fingerprints of value on internal K-Pak barcode # E1591937 and
compare with elimination prints previously submitted in captioned
case.

♦♦

030623001

3

**U.S. Department of Justice**

*Executive Office for United States Attorneys*
*Freedom of Information & Privacy Staff*
*600 E Street, N.W., Suite 7300, Bicentennial Building*
*Washington, DC 20530-0001*
*(202) 252-6020  FAX: 252-6047  (www.usdoj.gov/usao)*

Requester: Nacoe Ray Brown   Request No.:   12-1881                          MAY 30 2012

Subject: Self (specific records)/DMD

    The Executive Office for United States Attorneys (EOUSA) has received your Freedom of Information Act/Privacy Act (FOIA/PA) request. It has been assigned the above number. <u>Please give us this number if you write about your request</u>. If we need additional information, we will contact you within two weeks.

    Your request will be placed in the order in which it was received for processing, unless it is a very large request (Project Request). Then, it will be placed in a separate group of Project Requests, which are also processed in the order received.

    EOUSA makes every effort to process most requests within a month (20 working days). There are some exceptions; for example, Project Requests usually take approximately nine months to process. Requests for "all information about myself in criminal case files" are usually Project Requests. If you have made such a request, you may either write us and narrow your request for specific items, or you may expect that the processing of your request may take nine months from the date of this letter.

    By making a FOIA/PA request, you have agreed to pay fees up to $25, as stated in 28 CFR § 16.3(c), unless you have requested a fee waiver. Please note that pursuant to 28 CFR § 16.11, if you have not been granted a fee waiver, we are required to charge fees for time used to search for the documents you have requested and for duplication of all pages released to you. Normally, search time is charged at a rate of $28 per hour after the first two hours which are free, and duplication fees are $0.10 per page after the first 100 pages which are free. <u>Please do not send any payment at this time</u>! If we anticipate that fees will exceed $25 or the amount you have stated in your letter (if greater than $25), we will normally notify you of our estimate of fees. After we have received your agreement to pay for the expected fees (or you have narrowed your request to reduce fees) and we have processed your request, we will require payment for the accumulated charges before we release documents to you. Without such payment, your request file will be closed without further action.

Sincerely,

/s/

Susan B. Gerson
Acting Assistant Director

Form No. 001 - 4/11



U.S. Department of Justice

Ronald C. Machen Jr.
United States Attorney

*District of Columbia*

---

*Judiciary Center*
*555 Fourth St., N.W.*
*Washington, D.C. 20530*

May 15, 2012

Nacoe Ray Brown
Federal Registration Number: 34730-037
FCI McDowell
P.O. Box 1009
Welch, W. Va. 24801

Re: Freedom of Information Act Request for Records Concerning the Requester

Dear Mr. Brown:

The United States Attorney's Office for the District of Columbia received your Freedom of Information Act ("FOIA") request on May 15, 2012. Your FOIA request was forwarded to the Executive Office for United States Attorneys ("EOUSA") on May 15, 2012. EOUSA is the official record keeper for the records maintained in all United States Attorneys offices, and will respond to your request directly. Please direct all future correspondence to the following address:

Department of Justice
EOUSA/FOIA/PA Staff
BICN Bldg.
600 E Street, N.W., Suite 7300
Washington, D.C. 20530-0001
(202) 616-6757

Sincerely,

RONALD C. MACHEN JR.
United States Attorney

By: _____
Karin Kelly
Paralegal Specialist
FOIA Coordinator
Civil Division
555 4th Street, N.W.
Washington, D.C. 20530

cc: Department of Justice
EOUSA/FOIA/PA Staff
BICN Bldg.
600 E Street, N.W., Suite 7300
Washington, D.C. 20530-0001

**U.S. Department of Justice**

*United States Attorney*
*District of Maryland*
*Northern Division*

_____

Rod J. Rosenstein                  36 South Charles Street                    410-209-4800
United States Attorney             Fourth Floor                      TTY/TDD:410-962-4462
                                   Baltimore, Maryland 21201                  410-209-4812
Allen F. Loucks                                                          FAX 410-962-2310
Chief, Civil Division

                                   May 10, 2012

Mr. Nacoe Ray Brown
34730-037
FCI McDowell
PO Box 1009
Welch, West Virginia 24801

RE:    Freedom of Information Act/Privacy Act Request

Dear Mr. Brown:

       This office is in receipt of your FOIA/PA Request.  In accordance with the Department of
Justice regulations at 28 C.F.R. § 16.3 we have forwarded your Request to the FOIA/PA Unit in
Washington, D.C.  That office coordinates the processing of all FOIA Requests and will respond
directly to you.

       In order to accelerate the processing of your FOIA/PA Request, please direct all inquiries
to:

              Freedom of Information Act/Privacy Act Unit
              Executive Office for United States Attorneys
              600 E. Street, N.W., Room 7300
              Washington, D.C.  20530
              Tele: 202-616-6757
              Fax:  202-616-0478

Thank you for your attention in this matter.

                                   Very truly yours,

                                   Rod J. Rosenstein
                                   United States Attorney

                                   Allen F. Loucks
                                   Assistant United States Attorney



**U.S. Department of Justice**

**Federal Bureau of Investigation**

*Washington, D.C. 20535*

August 3, 2012

MR NACOE RAY BROWN
**34730-037
FCI MCDOWELL
POST OFFICE BOX 1009
WELCH, WV 24801

Subject: BROWN, NACOE RAY

FOIPA No. 1038199- 001

Dear Mr. Brown:

The enclosed documents were reviewed under the Freedom of Information/Privacy Acts (FOIPA), Title 5, United States Code, Section 552/552a. Deletions have been made to protect information which is exempt from disclosure, with the appropriate exemptions noted on the page next to the excision. In addition, a deleted page information sheet was inserted in the file to indicate where pages were withheld entirely. The exemptions used to withhold information are marked below and explained on the enclosed Form OPCA-16a:

|  | **Section 552** |  | **Section 552a** |
|---|---|---|---|
| ☐(b)(1) | ☐(b)(7)(A) | ☐(d)(5) |
| ☐(b)(2) | ☐(b)(7)(B) | ☒(j)(2) |
| ☒(b)(3)_____ | ☒(b)(7)(C) | ☐(k)(1) |
| Rule 6(e), FRCP;_____ | ☒(b)(7)(D) | ☐(k)(2) |
| 18 U.S.C., Section 2518_____ | ☒(b)(7)(E) | ☐(k)(3) |
| _____ | ☐(b)(7)(F) | ☐(k)(4) |
| ☐(b)(4) | ☐(b)(8) | ☐(k)(5) |
| ☐(b)(5) | ☐(b)(9) | ☐(k)(6) |
| ☒(b)(6) |  | ☐(k)(7) |

1082 **page(s)** were reviewed and 367 **page(s)** are being released.

☐ Document(s) were located which originated with, or contained information concerning other Government agency(ies) [OGA]. This information has been:

    ☐ referred to the OGA for review and direct response to you.

    ☐ referred to the OGA for consultation. The FBI will correspond with you regarding this information when the consultation is finished.

☐ In accordance with standard FBI practice, this response neither confirms nor denies the existence of your subject's name on any watch lists.

☐ You have the right to appeal any denials in this release. Appeals should be directed in writing to the Director, Office of Information Policy, U.S. Department of Justice,1425 New York Ave., NW, Suite 11050, Washington, D.C. 20530-0001. Your appeal must be received by OIP within sixty (60) days from the date of this letter in order to be considered timely. The envelope and the letter should be clearly marked "Freedom of Information Appeal." Please cite the FOIPA Number assigned to your request so that it may be easily identified.

☐ The enclosed material is from the main investigative file(s) in which the subject(s) of your request was the focus of the investigation. Our search located additional references, in files relating to other individuals, or matters, which may or may not be about your subject(s). Our experience has shown, when ident, references usually contain information similar to the information processed in the main file(s). Because of our significant backlog, we have given priority to processing only the main investigative file(s). If you want the references, you must submit a separate request for them in writing, and they will be reviewed at a later date, as time and resources permit.

☐ See additional information which follows.

Sincerely yours,

David M. Hardy
Section Chief
Record/Information
    Dissemination Section
Records Management Division

Enclosure(s)

This is in response to your Freedom of Information Act (FOIA) request for you, Nacoe Brown.

Please be advised that this is the first interim release of documents responsive to your request.

To expedite your request, the enclosed material is being sent in advance of payment. Pursuant to Title 28, Code of Federal Regulations, Section 16.11 and 16.49, there is a fee of 10 cents per page for duplication. No fees are assessed for the first 100 pages. This release consists of 367 pages. Please send a check or money order, in the amount of $26.70, payable to the FBI at the following address:

Work Process Unit
Record Information/Dissemination Section
Record Management Division
Federal Bureau of Investigation
170 Marcel Drive
Winchester, VA 22602

Please include the FOIPA number assigned to this request with your payment to insure proper crediting of your payment. If this payment is not received within 30 days from the date of this letter, we will administratively close this request. Please note that failure to submit payment will also cause an automatic denial of all future FOIPA requests.

U.S. Department of Justice

Federal Bureau of Investigation

Washington, D.C. 20535

MS. PAM GRIMM
SUITE 1000
11331 GROOMS ROAD
CINCINNATI, OH 45242

August 30, 2011

FOIPA Request No.: 1169167- 000
Subject: DISAPPEARANCE OF $36,000 CASH FROM BANK
ROBBERY TRIAL 1:01-CR-00377AMD-1

Dear Ms. Grimm:

This is in reference to your Freedom of Information-Privacy Acts (FOIPA) request.

In your request letter, you indicated your willingness to pay $200.00. We have located approximately 679 pages which are potentially responsive to your request. Pursuant to the U.S. Department of Justice (DOJ) regulations, 28 C.F.R. §§ 16.11 and 16.49, there is a duplication fee of ten cents per page if you receive a paper copy. Releases are also available on CD upon request. Each CD contains approximately 500 pages per release. The 500 page estimate is based on our business practice of processing medium and large track cases through interim releases that generally equal approximately 500 pages. The first 100 pages of duplication, or the cost equivalent ($10.00) for releases on CD, will be provided to you at no charge. In accordance with the DOJ regulations, the FBI notifies requesters when anticipated fees exceed $25.00. If all of the pages that are potentially responsive to your request are released, you will owe $57.90 in duplication fees to receive a paper copy or $20.00 (2 CD's at $15.00 less $10.00) to receive the release on a CD. Please remember this is only an estimate, and if some of the pages are withheld in full pursuant to FOIA/Privacy Act exemption(s) or are determined to not be responsive to your request, the actual charges could be less.

To accelerate the processing of your request, you may wish to consider reducing the scope of your request so that it will fall within one of the smaller queues. This may allow you to lower your search and duplication costs and hasten the receipt of your information. The FBI uses a three-queue system as a way to fairly assign and process new requests. The placement of a request in one of the three queues depends on the total number of pages responsive to that request - 500 pages or less (small queue), 501 pages to 2500 pages (medium queue), or more than 2500 pages (large queue). The small queue has the fastest rate of processing. Please let us know in writing if you are interested in discussing the possibility of reducing the scope of your request, as well as your willingness to pay the estimated search and duplication costs indicated in the above paragraph. Your written response should provide a telephone number where you can be reached between the hours of 8:00 a.m. and 5:00 p.m., EST, if one is available. Please send this response to: Work Process Unit, Record Information/Dissemination Section, Records Management Division, Federal Bureau of Investigation, 170 Marcel Drive, Winchester, VA 22602. You may also fax your response to the following number: 540-868-4997, Attention: Work Process Unit.

No payment is required at this time. However, you must notify us in writing within thirty (30) days from the date of this letter of your format decision (paper or CD) and your commitment to pay the estimated fee. If we do not receive your commitment to pay within thirty (30) days of the date of this notification, your request will be closed. Please include the FOIPA Request Number listed above in any communication regarding this matter.

Sincerely yours,

David M. Hardy
Section Chief,
Record/Information
Dissemination Section
Records Management Division

# MOTION UNDER 28 USC § 2255 TO VACATE, SET ASIDE, OR CORRECT SENTENCE BY A PERSON IN FEDERAL CUSTODY

| | |
|---|---|
| **United States District Court** | **District**<br>Northern of Baltimore Maryland |
| **Name of Movant**<br>Nacoe Ray Brown | **Prisoner's No.**<br>34730-037 |
| **Place of Confinement**<br>United States Penitentiary/Lee County, Virginia | **Docket No.** *PWD-01-0599*<br>*(PWD)-04-3510* |

FILED LODGED RECEIVED
NOV 07 200?
AT BALTIMORE
CLERK U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY _____ DEPUTY

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | V | (Include name upon which convicted)<br>**Nacoe Ray Brown**<br>(Full name of movant) |

## MOTION

1. Name and location of court which entered the judgment of conviction under attack
   District Court/Northern District of Baltimore, Maryland

2. Date of judgement of conviction   September 22, 2002

3. Length of sentence   (300 months) = (25) years

4. Nature of offense involved (all counts)   Armed Bank Robbery - Title 18 §2113 and 18 §2 Aiding and Abetting (four counts) I, II, III, and IV.

5. What was your plea? (Check one)
   - (a) Not guilty ☒
   - (b) Guilty ☐
   - (c) Nolo contendere ☐

6. Kind of trial: (Check one)
   - (a) Jury ☒
   - (b) Judge only ☐

7. Did you testify at trial?
   Yes ☐     No ☒

8. Did you appeal from the judgment of conviction?
   Yes ☒     No ☐

9.    If you did appeal, answer the following:

    (a)    Name of court   United states Court of Appeals for the Fourth Circuit

    (b)    Result   Denied (Appeal Docket # 03-4060)

    (c)    Date of Result   April, 2004

10.    Other than a direct appeal from the judgment of conviction and sentence, have you previously filed any petitions, applications or motions with respect to this judgement in any federal court?

    Yes ☐     No ☒

11.    If your answer to 10 was "yes," give the following information:

    (a)    (1) Name of court    N/A

          (2) Nature of proceedings

          (3) Grounds raised    N/A

          (4) Did you receive an evidentiary hearing on your petition, application or motion?

          Yes ☐     No ☒

          (5) Result             N/A

          (6) Date of result

    (b)    As to any second petition, application or motion, give the same information:

          (1) Name of Court        N/A

          (2) Nature of proceeding

          (3) Grounds raised         N/A

          (4) Did you receive an evidentiary hearing on your petition, application or motion?

          Yes ☐     No ☒

(5) Result _____ N/A

(6) Date of Result _____

(c)  As to any third petition, application or motion, give the same information:
    (1) Name of Court _____ N/A _____

    (2) Nature of proceeding _____

_____

    (3) Grounds raised _____
                       N/A

_____

_____

_____

_____

    (4) Did you receive an evidentiary hearing on your petition, application or motion?
Yes ☐     No ☒

    (5) Result _____ N/A _____

    (6) Date of Result _____

(d)  Did you appeal, to an appellate federal court having jurisdiction, the result of action taken on any petition, application or motion?
        (1) First petition, etc.     Yes ☐     No ☒
        (2) Second petition, etc.    Yes ☐     No ☒
        (3) Third petition, etc.     Yes ☐     No ☒

(e)  If you did not appeal from the adverse action on any petition, application or motion, explain briefly why you did not:
    My lawyer was "ineffective and let the (90) days period expire to file
    Certitori to the Supreme Court.  Thus causing Petitioner to lose that right.

_____

12.   State concisely every ground on which you claim that you are being held unlawfully. Summarize briefly the facts supporting each ground. If necessary, you may attach pages stating additional grounds and facts supporting same.

    CAUTION: If you fail to set forth all grounds in this matter, you may be barred from presenting additional grounds at a later date.

    For your information, the following is a list of the most frequently raised grounds for relief in these proceedings. Each statement preceded by a letter constitutes a separate ground for relief. You may raise any ground which you have other than those listed. However, you should raise in this motion all available grounds (relating to this conviction) on which you based your allegations that you are being held in custody unlawfully.

    Do not check any of these listed grounds. If you select one or more of these grounds for relief, you must allege facts. The motion will be returned to you if you merely check (a) through (j) or any one of the grounds.

(a) Conviction obtained by plea of guilty which was unlawfully induced or not made voluntary or with understanding of the nature of the charge and the consequences of the plea.
(b) Convictions obtained by use of coerced confession.
(c) Convictions obtained by use of evidence gained pursuant to an unconstitutional search and seizure.
(d) Convictions obtained by use of evidence obtained pursuant to an unlawful arrest.
(e) Convictions obtained by a violation of the protection against self incrimination.
(f) Convictions obtained by the unconstitutional failure of the prosecution to disclose to the defendant evidence favorable to the defendant.

(g) Convictions obtained by the violation of the protection against double jeopardy.
(h) Convictions obtained by action of a grand or petit jury which was unconstitutionally selected and impanelled.
(i) Denial of effective assistance of counsel.
(j) Denial of right of appeal.

A. Ground one: Petitioner not guilty of "Armed" Bank Robbery and his sentence over "offense statutory maximum" of plain bank robbery

Supporting FACTS (tell your story briefly without citing cases or law): Petitioner had a "toy gun" yet convicted of Armed Bank Robbery "three times." The maximum for plain bank robbery under statute is (20) years. The maximum for armed bank robbery is (25) years. The ELEMENT of "armed" under title 18 §2113 was never proven at trial.

   (see attached brief - space to small for complete issue)


B. Ground two: Prosecutorial Misconduct

Supporting FACTS (tell your story briefly without citing cases or law): The Prosecutor in my case "stole" the bank robbery money. Also withheld evidence from the jury.

Finally, failed to disclose under "Brady" that he was under/investigation and missing money from case to the defense lawyer or Petitioner.

   (see attached brief - space to small for complete issue)


C. Ground three: Ineffective assistance of counsel

Supporting FACTS (tell your story briefly without citing cases or law): The trial and appeal attorney were 100% "ineffective" as they failed to protect Petitioner with defense motions or proper appeal issues. Also, the attorney refused to spotlight the misconduct of the Prosecutor.

   (see attached brief - space to small for complete issue)

D. Ground four: _____

_____

_____

_____

_____

_____

Supporting FACTS (tell your short briefly without citing cases or law): _____

_____

_____

_____

_____

_____

13.  If any of the grounds listed in 12A, B, C, and D were not previously presented, state briefly what

grounds were not so presented, and give your reasons for not presenting them: _____

"None" of them.  Due to "ineffective assistance of counsel" who refused to listen

to his clients **wishes for** motions to be filed and/or what issues to put into direct

appeal brief.

_____

14.  Do you have any petition or appeal now pending in any court as to the judgement under attack?
     Yes ☐        No ☒

15.  Give the name and address, if known, of each attorney who represented you in the following stages
     of the judgement attacked herein:

     (a) At preliminary hearing _____ Kenneth W. Ravenell, 410 East Pratt Street, 1800 World

     Trade Center — Baltimore, Maryland 21202  (410) 659-0111

     (b) At arraignment and plea _____ Same as above

     (c) At trial _____ Same as above

     (d) At sentencing _____ Same as above

     (e) On appeal _____ Same as above

(f) In any post-conviction proceeding    N/A    (Pro-se)

(g) On appeal from any adverse ruling in a post-conviction proceeding

N/A

16. Were you sentenced on more than one count of an indictment, or on more than one indictment, in the same court at approximately the same time?

Yes ☒        No ☐

17. Do you have any future sentences to serve after you complete the sentence imposed by the judgement under attack?

Yes ☐        No ☒

(a) If so, give name and location of court which imposed sentence to be served in the future:

N/A

(b) Give date and length of the above sentence:

N/A

(c) Have you filed, or do you contemplate filing, any petition attacking the judgement which imposed the sentence to be served in the future?

Yes ☐        No ☒

Wherefore, movant prays that the Court grant him all relief to which he may be entitled in this proceeding.

_____ (PRO-SE)
Signature of Attorney (if any)

I declare under penalty of perjury that the foregoing is true and correct.  Executed on:

Oct. 20, 2004
(date)

_____
Signature of Movant

Page # 7 of 7

## PROOF OF SERVICE

Applicant must send a copy of this application and all attachments to the United States Attorney's office in the district in which you were convicted.

I certify that on ___Oct. 20, 2004___, I mailed a copy of this Application*
                             [date]

and all attachments to   Harry M. Gruber

at the following address: Assistant United States Attorney
6625 U.S. Courthouse
101 W. Lombard Street
Baltimore, Maryland 21201

_____ (Pro se)
Applicant's Signature

Mailed was:

1) §2255 Motion of Habeas Corpus

2) Exhibits in Support of Issues

3) Proof of Service

4) Sworn Statement under §1746

* Pursuant to Fed. R. App. P. 25(a), "Papers filed by an inmate confined in an institution are timely filed if deposited in the institution's internal mail system on or before the last day of filing. Timely filing of papers by an inmate confined in an institution may be shown by a notarized statement or declaration (in compliance with 28 U.S.C. § 1746) setting forth the date of deposit and stating that first-class postage has been prepared."

IN THE UNITED STATES COURT
FOR THE NORTHERN DISTRICT OF
BALTIMORE, MARYLAND

NACOE RAY BROWN
    Petitioner,

    vs.                  Docket # _____

UNITED STATES OF AMERICA,
    Respondent.

---

**SWORN STATEMENT UNDER TITLE 28 U.S.C. §1746 AND 18 U.S.C. §1621**
**UNDER PENALTY OF PERJURY FOR FALSE FACTS OR STATEMENTS ...**

    I, Nacoe Ray Brown certify under penalty of perjury that I am the Plaintiff-Petitioner in the above action.  That the motion, writ, affidavit, exhibits and all information of case facts (history) are 100% true.  Submitted by my hand on this date; _____OCT 20____, _____, 2004.

_____
(Pro-Se)

IN THE UNITED STATES
DISTRICT COURT FOR THE
DISTRICT OF MARYLAND
NORTHERN DIVISION

|  |  |
|---|---|
| NACOE RAY BROWN, | X |
|     Defendant-Appellant, | : |
|  | : |
| vs | : DOCKET # _____ |
|  | : |
| UNITED STATES OF AMERICA, | : |
|     Respondent. | : |
|  | X |

### §2255 MOTION OF HABEAS CORPUS

Brief for Defendant – Appellant; Nacoe Ray Brown and Exhibits in support of issues raised.

Respectfully submitted,

Nacoe Ray Brown
Reg. # 34730-037
United States Penitentiary
Lee County
P.O. Box 305
Jonesville, VA  24263-0305

## PROCEDURAL HISTORY

Petitioner was originally indicted on July 10, 2001.  A superseding indictment was filed on April 29, 2001.

**Count One:  Charged Petitioner with a armed bank robbery of the Key Bank and Trust on June 8, 2001**

**Count Two:  Charged Petitioner with armed bank robbery of the Patansco Bank on May 11, 2001.**

**Count Three:  Charged Appellant with armed bank robbery of the Mercantile Safe Deposit and Trust Company on April 4, 2001.**

**Count Four:  Charged Appellant with armed bank robbery of the First Mariner Bank on March 12, 2001.**

Petitioner pled not guilty and had a nine day jury trial which ended on September 26, 2002.  The jury found Petitioner guilty of counts 2, 3, and 4.  The trial judge declared a mistrial as to count 1.  Appellant was sentenced on December 13, 2002, to a term of (300 months = 25 years).  Appellant filed an direct appeal, containing the below issues:

I.  The trial court erred in denying Appellant's motion to suppress the search of 3012 Kentucky Avenue.

II.  The trial court erred in admitting certain 404(b) evidence.

III.  Did the trial court err in excusing a juror over defense objection.

IV.  Did the trial court err in admitting a letter written by Appellant to Kevin Hillard after his incarceration.

V.  Did the trial court err in denying defense motion for mistrial and motion to withdraw as counsel due to conflict.

VI.  Did the trial court err in denying defense motion for continuance to obtain separate counsel to cross-examine Hillard.

VII.  Did the trial court err in denying defense second motion for mistrial due to Kevin hilliard's statement about defense counsel during testimony.

VIII.  Did the trial court err in not allowing the defense to call Frank Kelly as a witness.

-1-

## JURISDICTIONAL STATEMENT

Petitioner's direct appeal was denied in (April 2004). You have one year from date of denial under the (ATEDPA) of 1996 to file your first §2255 Writ of Habeas Corpus. Petitioner had until (April 2005) to file or otherwise, be time barred to do so. This is August-September, 2004; well within the one-year period.

## STATEMENT OF THE FACTS

1) Petitioner was convicted under title 18 §2113(d) "armed" bank robbery for counts 2, 3, and 4. Count (1) was declared a mistrial.

2) The prosecutor in case at bar committed massive "Prosecutor Misconduct," and was under criminal investigation for theft of bank robbery money used as partial evidence in case, as it disappeared and was not shown to jury as requested/ required by the jury and law.

3) Pretrial, at trial, and on direct appeal, Petitioner had "ineffective assistance of counsel." Also, at his sentencing, counsel let Petitioner be sentenced over the "offense statutory maximum" of unarmed bank robbery, in violation of law, and failed in several key areas to protect client's constitutional rights.

-3-

## STATEMENT OF THE ISSUES

1) Petitioner had a "toy gun" for all four banks charged in indictment.  The prosecutor/government concedes/agrees with this.  Yet, he is still charged and convicted under title 18 §2113(d) armed bank robbery instead of (a) plain bank robbery. Armed bank robbery under (d) has a "offense statutory maximum" of (25) years. Unarmed bank robbery under (a) has a "offense statutory maximum" of (20) years. Petitioner's sentence is illegal as it is (5) years over the legal statutory maximum.

2) The Petitioner's (3) counts of conviction for "armed" bank robbery is invalid. When in fact and law, this element was never proven or committed in reality and raises to a "due process of law" violation of the Sixth Amendment right to a fair trial. Petitioner – was  charged and found guilty three times of "armed" bank robbery. This prejudices all the counts and requires reversal.

3) The prosecutor in case had a secret dark side and it was covered up at Pre-trial, trial and on direct appeal.  This requires reversal of convictions and a new trial ordered.

4) Petitioner's lawyer, Pre-trial, trial, sentencing and on direct appeal was "Ineffective" on a mass scale.  In all areas of legal protection, counsel "failed." This requires reversal of conviction.

5) The combined effect of all issues requires reversal of convictions and a remand for a new trial.

## QUESTIONS OF LAW TO BE ANSWERED

1)  Whether a "toy gun" can legally support a conviction under title 18 §2113(d) Armed Bank Robbery?

2)  Should Petitioner's convictions be reversed due to the prosecutor's misconduct during trial, sentence and on direct appeal?

3)  Can an United States Assistant District Attorney who is under criminal investigation for theft of trial "bank robbery money" still be allowed to proceed in case or should a mistrial have been ordered?

4)  Whether under "Discovery" and "Brady" laws, the prosecutor violated continuing disclosure to defense counsel and Petitioner?  And does this breach of law require reversal of case?

5)  Was the trial counsel "ineffective" in these areas?  Any one of a dozen, standing along would reverse convictions.

    A.  Failed to file for continuing discovery.

    B.  Did not know facts of laws and case.

    C.  Let his client be charged (4) times under "armed."

    D.  Failed to file Cert/S.Ct. Appeal when told to do so.

    E.  Failed to file suppression motions.

    F.  Failed to protect client against "Brady" violations.

    G.  Did not prepare for trial.

-5-

H. Didn't obtain discovery when it was found out that prosecutor was a crook.

I. Didn't understand "elements" of crime charged.

J. Failed to challenge the priors and career offender.

K. Failed to move for mistrial.

L. Failed to consult with defendant about prosecutor's misconduct.

M. Failed to impeach prosecutor.

N. Counsel provoked errors by not knowing the law.

O. Failed to develop facts.

P. Failed to subject prosecution's case to a meaningful adverse testing process.

Q. Failed to raise insufficiency of evidence.

R. Failed to respond to jury that the trial money was stolen and <u>not</u> in evidence anymore.

S. Counsel cumulative errors require reversal.

T. Failed to raise meritorious issues on appeal when told to do so.

## ISSUES

I.  DEFENDANT CANNOT BE CHARGED UNDER TITLE 18 §2113(d) "ARMED BANK ROBBERY" FOR A TOY GUN.....

-AND-

THE CONVICTIONS ON ALL THREE COUNTS REQUIRE REVERSAL AS AN ILLEGAL VARIANCE OCCURRED BETWEEN INDICTMENT CHARGES AND THE PROOF AT TRIAL; WHICH IS PREJUDICE AND FATAL TO THE INDICTMENT.

---

The indictment in case at bar contained (4) four counts of "armed" bank robbery When in fact and law, no guns existed. Petitioner had a toy weapon. The element of section (d) in title 18 §2113 for "armed" requires proof that a weapon must be objectively capable of putting victim's life in danger. **United States v. Cobb**, **C.A. 8 (MO) 1977, 558 F.2d 486.**

In order to sustain conviction under sub section (d) of this section which penalizes the use in a bank robbery of any weapon or device which jeopardizes the lives of others, government must establish that perpetrator assaulted a person or jeopardized the life of a person by using a dangerous weapon or device during commission of the robbery, **United States v. Crew**, C.A. 4 (VA.) 1976: 538 F.2d 575.

Further, unless defendant is in possession of a dangerous WEAPON capable of placing lives in jeopardy, no violation of title 18 §2113(d) "armed" bank robbery exists. **United States v. Ray**, **C.A. (District of Columbia) 1994: 21 F.3d 1139.**

Petitioner in case at bar had a "toy gun." This doesn't prove the element of a weapon. The three (3) convictions under section (d) are over the "offense statutory maximum" of (A), which is unarmed bank robbery. The cure is not a resentencing but a dismissal of the indictment. As a fatal variance occurred in the indictment charges issued by the Grand Jury -vs- the proof at trial of "armed" or "unarmed." Petitioner's trial jury heard four times in four different banks that Petitioner "armed" with a gun, when, in fact and law, it was a "toy" and as such, not legally allowed to be used as

element/exhibit of proof to satisfy the showing of armed under section (d) of 18

§2113.  The trial jury was allowed to use as evidence for the (element/proof) of

subsection (d) "armed" requirement.  "A toy" in violation of law.  This variance

fatal to entire indictment.  **United States v. Johnson, 56 F.3d 347 (C.A. 2nd)**

**May 4, 1995.**

## II. PROSECUTOR MISCONDUCT

The prosecutor in case at bar had a dark side and financial problems.  (See exhibit

"B") attached, which is "Baltimore Sun" newspaper article, dated December 9, 200?

(See page (3) of this section).  Petitioner's trial bank robbery money "disappeared"

by theft.  (See exhibit "C") attached.  (page 2).  The prosecutor was under criminal

investigation for theft of $36,000.00 of Petitioner's (trial evidence) bank robbery

money.  The money was admitted as evidence, then stolen.  But, the jury was told a

lie and information withheld from the jury when they wished to see **all** the evidence

of trial in jury room.  (See exhibit "D") θ page (2) and (Exhibit "E") - trial tran-

script, line (13).  The trial court instructed the jury, "we didn't send the money

because the United States Attorney's office or the F.B.I. has it.  This wasn't true

and a lie.  As the money was **stolen.**

The trial court also instructed the jury that all the evidence including money

would be sent to jury room.  This wasn't true.  He further stated all the exhibits

are in order.  (See exhibit "F") (trial transcripts - page 1572 [Lines 9-11]).  The

jury sent out a note asking for **all** the trial evidence which the money was a part of.

(See Exhibit "F") - page 1582, line (7) at page 1583 (lines 10-22)).  The cover-up of

stolen money was hidden from the Petitioner, the trial jury and defense counsel.

This blatant violation of due process of law to discovery, Brady violations and

fairness requires dismissal of indictment and a new trial ordered.

## PROSECUTORIAL MISCONDUCT

... A prosecutor withheld exculpatory evidence.  See **United States v. Alzate**, 47 F.3d 1103 (11th Cir. 1995).

... A prosecutor has a continuing duty to disclose ... See;

**United States v. Hana**, 55 F.3d 733 (9th Cir. 1995)
**United States v. Wood**, 57 F.3d 733 (9th Cir. 1995)
**United States v. Arnold**, 117 F.3d 1308 (11th Cir. 1997)
**United States v. Fernandez**, 136 F.3d 1434 (11th Cir. 1998)
**United States v. Scheer**, 168 F.3d 445 (11th Cir. 1999)
**United States v. Mesa**, 153 F.3d 925 (9th Cir. 1998)

All reversed due to prosecutor error.

**Evidence held back by Prosecutor:**

See:  130 F.3d 365 (9th Cir. 1997)
      186 F.3d 601 (5th Cir. 1999)

Above cases reversed due to prosecutor error.

**"Loss" of evidence, cash at trial, by Prosecutor**

See:  189 F.3d 88 (2nd Cir. 1999)

Case reversed due to prosecutor losing evidence.

**Suppression of evidence by Prosecutor**

See:  230 F.3d 733

The Prosecutor suppressed the fact that money was "lost."

**Government Misconduct/ for Prosecutor**

See:  30 L.Ed. 220 (1886)
      192 F.3d 647 (7th Cir. 1999)
      79 L.Ed. 2nd 1314

-9-

**Chain of Custody of Evidence:**

See: <u>California v. Trombetta</u>, 467 U.S. 479 (1989) ... The Supreme Court held that the constitution requires the government to preserve evidence "that might be expected to play a significant role in the suspect's defense."

Case reversed and remand.

**The Prosecutor failed to release "Brady" material:**

    See: <u>Parkus v. Delo</u>, 33 F.3d 433 (8th Cir. 1994)
         <u>Tate v. Wood</u>, 963 F.2d 20 (2nd Cir. 1992)

**Prosecutor misconduct cases in support of issue:**

See: <u>Robinson v. Maynard</u>, 829 F.2d 150 (10th Cir. 1987)
     <u>Reynolds v. Ellingsworth</u>, 843 F.2d 712 (3rd 1988)
     <u>Freeman v. Can</u>, 962 F.2d 1252 (7th Cir. 1992)
     <u>Martire v. Wainwright</u>, 811 F.2d 1430 (11th Cir. 1987)

All reversed due to Prosecutorial Misconduct.

Additionally, see exhibits "G," "H," and "I." All show that the prosecutor in Petitioner's case **could** and **did** taint Petitioner's entire trial.

The prosecutor's misconduct was covered up and not disclosed to Petitioner or his defense counsel. Any and all investigations the prosecutor was under during Pre-trial, trial, sentence and on appeal should have been disclosed to Petitioner and defense counsel. The constitutional amendment (Sixth) guarantees a right to a fair trial. This was denied to Petitioner due to the misconduct of prosecutor in case at bar. Then the cover up of his actions and possible further criminal conduct wasn't told to Petitioner or counsel.

The totality of all evidence found "after" Petitioner's trial and sentence through the public forum show quite clearly that known facts were hidden from the defendant and counsel intentionally. This is a violation of due process of law

under the Fifth and Sixth constitutional amendments.  Thus, denying a right to a fair trial.

## III.  Ineffective Assistance of Counsel Pre-trial, Trial, Sentencing and on Direct Appeal

The right to counsel guaranteed by the Sixth Amendment "is the right to the effective assistance of counsel." McMann v. Richardson, 397 U.S. 759, 777 N.4 (1970) ... also see: Avery v. Alabama, 308 U.S. 444, 446 (1940).  In Strickland v. Washington, 466 U.S. 668 (1984), the Supreme Court established a performance and prejudice test by which to evaluate the claim that counsel in a criminal case has been ineffective. In order to have a conviction reversed, the Defendant must demonstrate:  (1) that counsel's performance fell below an objective standard of reasonableness, and (2) that the poor performance prejudiced the outcome of the proceedings.  Id. at 687-88.

Petitioner's trial counsel failed to file suppression motions can amount to ineffective assistance of counsel.  See: Kimmelman v. Morrison, 477 U.S. 365, 385 (1986); King v. United States, 95 F.3d 1052 (11th Cir. 1996); Maxey v. U.S., 98 F.3d 844 (5th Cir. 1996).

The Pre-trial counsel failed to suppress a defective indictment that listed "armed" under title 18 §2113, when in fact and law, no real gun existed.  This caused Petitioner to receive five additional years in prison.  Also, counsel failed to suppress the "prosecutor's misconduct" by way of motion.  This amounted to reversible error due to an ineffective counsel.

Petitioner's attorney inadequate performance and preparation is that he never once conferred with Petitioner regrading the "prosecutor misconduct" at Pre-trial, trial, sentence, nor on direct appeal.  See: ...United States v. Cronic, 466 U.S. 648 80 L.Ed. 2d 657, 654, 104 S.Ct. 2039.  Id. at 466 U.S. 652, 653.

The trial counsel failed to file notice of (Cert.) to the Supreme Court, thereby causing Petitioner to lose this appeal right.  Failure to file a notice of appeal is

-11-

"ineffective counsel." Additionally, Petitioner was never informed that his direct appeal was denied by counsel. Petitioner's wife just decided to call the court clerk on a whim and inquire about status of appeal. She was told it was denied three (3) months prior. She called in July, 2004. It was denied in April, 2004.

    See: 68 F.3d 328 (11th Cir. 1995)
         81 F.3d 1083 (11th Cir. 1996)
         68 F.3d 328 (9th Cir.)

Ineffective counsel <u>not</u> to file notice of appeal as shown by case law above.

Counsel was "ineffective" for failing to file suppression motions and/or support Petitioner in his defense, once it became known of prosecutor's misconduct. It is ineffective assistance of counsel not to file Suppression Motions ... see: <u>United States v. King</u>, 95 F.3d 1052 (11th Cir. 1996); <u>United States v. Maxey</u>, 98 F.3d 844 (5th Cir. 1996). Additionally, the trial attorney 100% refused to fight the "prosecutorial misconduct" issue post-trial. Once it was learned and became common knowledge by newspapers and the public forum. (See exhibit "K") - Counsel's letter to Petitioner <u>refusing</u> to fight or support his client against misconduct. (See exhibits "B", "C", "D", "E", "G", "H", "I" and "J"). All show how extensive and blatant this prosecutor's actions were. Also, a criminal investigation was being had to determine if he did in fact, steal evidence. All this has/had direct bearing on Petitioner's case, and warrant trial reversal due to ineffective assistance of counsel. (See exhibit "L"), which are the seven motions Petitioner attempted to file through his lawyer that counsel rejected and left Petitioner on his own. The end result was the "prosecutor misconduct" issue was never fought. Due to ineffective assistance of counsel.

Counsel was ineffective for failing to GET additional discovery due to newly discovered evidence of Prosecutorial Misconduct. Which were also **"Brady"** violations ... this was/is ineffective counsel that requires reversal of convictions. See:

    758 F.2d 154 (11th Cir. 1985)
    193 F.3d 766 (3rd Cir. 1999)
    569 F.Supp. 146 (W.D. Tex. 1983)
    822 F.2d 1041 (11th Cir. 1987)

-12-

**The trial attorney was ineffective for not seeking "Voir dire" of a — JUROR — who knew exculpatory witness personally ...**

See: <u>Government of Virgin Island v. Weatherwax</u>, 20 F.3d 572 (3rd Cir. 1994).

...Trial counsel's failure to seek "voir dire" of juror who exposed to newspaper article constitutes ineffective assistance of counsel and warrants evidentiary hearing.

Petitioner's counsel failed to announce the defenses desire to call a exculpatory witness until the eighth day of trial when the District Court read the name of this witness, along with other defense witnesses. One juror indicated she thought she recognized Mr. Kelly's name. Viewed against this backdrop, the court precluded Defendant from calling this witness. At this point, the trial counsel should have sought "voir dire" of this juror, looking for the extent of her personally knowing an exculpatory witness. How did she know him? Would she have contact with him during trial? Would her knowing him "influence" her vote, as she knew he was a "Pro" Petitioner? A hundred other questions exist to have asked her. The crux of this ineffective assistance of Counsel is, Counsel <u>failed</u> to seek voir dire, and this is reversible error. The trial judge <u>dismissed</u> an exculpatory witness due to the fact a juror knew him, yet ineffective counsel <u>LET</u> the court have its way without a defense response.

The above compounds into appellate counsel's ineffectiveness as trial counsel failed to correct his error on appeal and request the voir dire transcripts to bring issue up on direct appeal. See: <u>Smith v. Wainwright</u>, 741 F.2d 1248 (11th Cir. 1984) ... appellate counsel's failure to request transcripts of entire voir dire proceedings was ineffective assistance of counsel.

**Trial counsel failed to consult with Petitioner about the legal ratifications of the juror, who knew witnesses. Should have been challenged ...**

See: <u>White v. Godinez</u>, 143 F.3rd 1049 (7th Cir. 1998).

... Counsel's failure to consult with client on major error is reversible error ...

-13-

## Trial counsel failed to prepare for trial ...

He submitted a witness list in the eighth day of trial, never investigated the witnesses or their testimony. The witness excluded due to a juror knowing him. Would have been found out in advance, since lawyer had list of JURY names for eight days prior to witness being in court.

If a trial counsel fails to investigate witnesses or interview them per trial, it is ineffective assistance of counsel. See: **Holliness v. Estelle**, 569 F.Supp. 146 (W.D. Tex 1983); **Stokes v. Peyton**, 437 F.2d 131 (4th Cir. 1970); and **Hyman v. Aiken**, 824 F.2d 1405 (4th Cir. 1987).

See: Exhibit "M" – attached; which is brief of Appellee/Government (page 54), on direct appeal; showing the witness was excluded due to a juror knew him, but counsel 100% failed to "voir dire" juror, and protect the outcome of the trial and give Petitioner the legal constitutional right to have effective counsel.

-14-

... Trial counsel's failure to raise issue of insufficient evidence at end of trial or move for dismissal on insufficient evidence constituted ineffective counsel.

At the least, to be effective, the trial counsel should have moved for an evidentiary hearing and to expand the record to include dates, names, and why an investigation was moving forward to find out who stole evidence in case at bar and how far did this prosecutor's dark side go. The dates are especially important as Petitioner was on trial and this prosecutor prosecuted the case. See: **U.S. v. Chandler**, 950 F.Supp. 1545 (1996)(**N.D. ALA. 1996**), ... evidentiary hearing warranted on Habeas claim for government's failure to disclose the money gone or evidence in case lost.

The trial counsel was ineffective for not fighting the §851 enhancement of "prior felony" arrests. When in fact and law, Petitioner <u>not</u> a career criminal, due to invalid priors. That doesn't count as prong/convictions to support enhancement under §851. This caused Petitioner's sentence to be increased ... see: **United States v. McCoy**, 215 F.2d 102 (D.C. Cir. 2000).

Trial and appeal counsel failed to "impeach" prosecutor after it became known of his misconduct. See: **Hadley v. Groose**, 97 F.3d 1131 (8th Cir. 1996), **Thomas v. Calderon**, 120 F.2d 30 1045 (9th Cir. 1997).

Appeal counsel "provoked errors" by refusing to speak up and defend post-trial "prosecutorial misconduct". This was ineffective counsel. See: **Taylor v. Starnes**, 650 F.2d 38 (4th Cir. 1981); **Harding v. Davis**, 878 F.2d 1341 (11th Cir. 1989).

Appeal counsel failed to develop facts of entire scope of trial prosecutor's misconduct and known dates of any and all investigations concerning the trial Assistant United Attorney, especially in view of the fact that tens of thousands of dollars vanished from instant case ... it is ineffective counsel to fail to develop facts ... see: **Rogers v. Israel**, 746 F.2d 1288 (7th Cir. 1984); **Smith v. Wainwright**, 799 F.2d 1442 (11th Cir. 1986).

-15-

Appeal counsel failed to subject the prosecution's case to a meaningful adverse testing process when he 100% refused to investigate the "Prosecutorial Misconduct" when told to do so by his client. This is ineffective counsel. See:

United States v. Cronic, 466 U.S. 468 80 L.Ed. 2d 657 (1984)
United States v. Glover, 97 F.3d 1345 (10th Cir. 1996)
United States v. Swanson, 943 F.2d 1070 (9th Cir. 1991)
United States v. Davis, 878 F.2d 1341 (11th Cir. 1989)

Counsel's failure to file "Dead Bang" winner issue of "Prosecutorial Misconduct" on appeal and/or Post trial/appeal is ineffective assistance of counsel ... See: United States v. Cook, 45 F.3d 385 (10th Cir. 1995) ... and ineffective counsel to not raise meritorious issues on appeal ... see ... Douglas v. Wainwright, 714 F.2d 1532 (11th Cir. 1983); and Banks v. Reynolds, 54 F.3d 1508 (10th Cir. 1995).

Finally, the combined "cumulative" errors of trial and appeal counsel warranted reversal of case, and remand for a new trial. See:

Crisp v. Duckworth, 743 F.2d 508 (7th Cir. 1984)
Blackburn v. Foltz, 828 F.2d 1177 (6th Cir. 1987)
Henry v. Scully, 78 F.3d 51 (2nd Cir. 1996)
Nealy v. Cabana, 764 F.2d 1173 (5th Cir. 1985)

All reversed due to "totality" of many errors that when they are combined, reflect reversable error due to ineffective assistance of trial counsel.

## CONCLUSION

The violation of Brady v. Maryland, 10 L.Ed. 215 by the Prosecutor for broad disclosure obligations that/was violated in case at bar, for the missing money and any and all investigations being had on prosecutor during dates of Petitioner's trial and appeal. This warranted reversal of case, or at the least, an evidence hearing to develop facts and expand the record.

The false testimony in the record by prosecutor and the trial judge, which misled the jury and "hid" the fact that evidence is "missing" warranted reversal of convictions and a new trial.

-16-

The "totality" of counsel's errors at trial and on direct appeal warrant reversal of convictions and a new trial.

Petitioner was charged with "armed" under title 18 §2113 for a fake gun, when he should have been charged under (A) unarmed. This was an illegal variance and require dismissal of indictment.

Respectfully submitted,

Nacoe Ray Brown    (pro-se)

-17-

## EXHIBITS

A.  Title 18 U.S.C. :2113

B.  Newspaper Article:  Baltimore Sun - December 9, 2003

C.  Newspaper Article:  Baltimore Sun - February 13, 2004

D.  Newspaper Article:  Baltimore Sun - March 3, 2004

E.  Trial Transcript (page 1592)

F.  Trial Transcript (pages 1572-1600)

G.  Newspaper Article:  Baltimore Sun - May 4, 2004

H.  Newspaper Article:  Baltimore Sun - April 2004

I.  Newspaper Article:  New York Post - March 31, 2004

J.  Newspaper Article:  New York Post - April 9, 2004

K.  Trial and appeal lawyer refusing to file against Prosecutorial Misconduct by letter.

L.  Seven (pro se) defense motions the Petitioner sought to have attorney file.  Once Petitioner became aware of prosecutorial misconduct,  The attorney refused to file them.

   1) **Notice of Motion seeking new trial pursuant to Criminal Rules of Procedures Rule "33."**
   2) **Affidavit in support of Discovery Motions**
   3) **Notice of Motion seeking to have the Government turn over additional discovery information**
   4) **Affidavit to stay appeal until review of additional case facts "Prosecution Misconduct" can be revised**
   5) **Affidavit of "Prosecutor Misconduct"**
   6) **Notice of Motion seeking permission to file motion for new counsel**
   7) **Notice of Motion seeking new counsel**

M.  Brief of Appallate (direct appeal) page (54)

USCA4 Appeal: 12-394    Doc: 2-2    Filed: 12/14/2012    Pg: 39 of 49

postal nexus or for full trial on question whether attempted robbery was completed; he nonetheless may be convicted of money orders from post office was under this section, but rather count II should be dismissed. U. S. v. Rivera, C.A.2 (N.Y.) 1975, 513 F.2d 519, certiorari denied 96 S.Ct. 367, 423 U.S. 948, 46 L.Ed.2d 284.

**23.  Writ of error**

On contention indictment for robbery of money orders from post office was under this section, and that under law other than that under which sentence was imposed, remedy was writ of error, not habeas corpus. Docker v. White, C.C.A.8 (Kan.) 1928, 25 F.2d 74.

## § 2113.  Bank robbery and incidental crimes

(a) Whoever, by force and violence, or by intimidation, takes, or attempts to take, from the person or presence of another, or obtains or attempts to obtain by extortion any property or money or any other thing of value belonging to, or in the care, custody, control, management, or possession of, any bank, credit union, or any savings and loan association; or

Whoever enters or attempts to enter any bank, credit union, or any savings and loan association, or any building used in whole or in part as a bank, credit union, or as a savings and loan association, with intent to commit in such bank, credit union, or in such savings and loan association, or building, or part thereof, so used, any felony affecting such bank, credit union, or such savings and loan association and in violation of any statute of the United States, or any larceny—

Shall be fined under this title or imprisoned not more than twenty years, or both.

(b) Whoever takes and carries away, with intent to steal or purloin, any property or money or any other thing of value exceeding $1,000 belonging to, or in the care, custody, control, management, or possession of any bank, credit union, or any savings and loan association, shall be fined under this title or imprisoned not more than ten years, or both; or

Whoever takes and carries away, with intent to steal or purloin, any property or money or any other thing of value not exceeding $1,000 belonging to, or in the care, custody, control, management, or possession of any bank, credit union, or any savings and loan association, shall be fined not more than $1,000 or imprisoned not more than one year, or both.

(c) Whoever receives, possesses, conceals, stores, barters, sells, or disposes of, any property or money or other thing of value which has been taken or stolen from a bank, credit union, or savings and loan association in violation of subsection (b), knowing the same to be property which has been stolen shall be subject to the punishment provided for the taker ... for the taker ...

(d) Whoever, in committing, or in attempting to commit, any offense defined in subsections (a) and (b) of this section, assaults any person, or puts in jeopardy the life of any person by the use of a dangerous weapon or device, shall be fined under this title or imprisoned not more than twenty-five years, or both.

(e) Whoever, in committing any offense defined in this section, or in avoiding or attempting to avoid apprehension for the commission of such offense, or in freeing himself or attempting to free himself from arrest or confinement for such offense, kills any person, or forces any person to accompany him without the consent of such person, shall be imprisoned not less than ten years, or if death results shall be punished by death or life imprisonment.

(f) As used in this section the term "bank" means any member bank of the Federal Reserve System, and any bank, banking association, trust company, savings bank, or other banking institution organized or operating under the laws of the United States, including a branch or agency of a foreign bank (as such terms are defined in paragraphs (1) and (3) of section 1(b) of the International Banking Act of 1978), and any institution the deposits of which are insured by the Federal Deposit Insurance Corporation.

(g) As used in this section the term "credit union" means any Federal credit union and any State-chartered credit union the accounts of which are insured by the National Credit Union Administration Board, and any "Federal Credit Union" as defined in section 2 of the Federal Credit Union Act. The term "State-chartered credit union" includes a credit union chartered under the laws of a State or the United States, the District of Columbia, or any commonwealth, territory, or possession of the United States.

(h) As used in this section, the term "savings and loan association" means—

(1) a Federal savings association or State savings association (as defined in section 3(b) of the Federal Deposit Insurance Act (12 U.S.C. 1813(b)) having accounts insured by the Federal Deposit Insurance Corporation; and

(2) a corporation described in section 3(b)(1)(C) of the Federal Deposit Insurance Act (12 U.S.C. 1813(b)(1)(C)) that is operating under the laws of the United States.

June 25, 1948, c. 645, 62 Stat. 796; Aug. 3, 1950, c. 516, 64 Stat. 394; Apr. 8, 1952, c. 164, 66 Stat. 46; Sept. 22, 1959, Pub.L. 86-354, § 2, 73 Stat. 639; Oct. 19, 1970, Pub.L. 91-468, § 8, 84 Stat. 1017; Oct. 12, 1984, Pub. L. 98-473, Title II, § 1106, 98 Stat. 2145; Nov. 10, 1986, Pub.L. 99-646, § 65, 100 Stat. 3616; Aug. 9, 1989, Pub.L. 101-73, Title IX, §§ 962(a)(1), 103 Stat. 502, 503; Pub.L. 101-647, Title XXV, § 2597(l), Nov. 29, 1990, 104 Stat. 4911; Sept. 13, 1994, P.L. 103-322, Title VI, § 6000, 3391, Title ...

Contact Us | Advertise | Home Delivery | Site Map | Print Edition | Services    DEC. 9 2003    (B)    Become a mySun



HOME | MARYLAND | NATION/WORLD | BUSINESS | SPORTS | ARTS/LIFE | OPINION | MARKETPLACE

Search: [          ] Go ⊙ Site ○ Web

**maryland news**

# Slain prosecutor's relationships with women examined

*Investigation focusing on personal life of Luna; Possible financial, work troubles*

**BY GAIL GIBSON**
**SUN STAFF**
ORIGINALLY PUBLISHED DECEMBER 9, 2003

Authorities working to solve the mysterious slaying of a Baltimore federal prosecutor are examining his personal relationships with women and possible financial and work-related problems, a law enforcement official said yesterday.

At the time of his death, Jonathan P. Luna had about $25,000 in credit card debt, the official said.

Other sources said Luna, 38, had expressed concern in recent weeks that he had fallen out of favor with his supervisors at work and might have to change jobs - a notion Maryland U.S. Attorney Thomas M. DiBiagio flatly denied last night.

The law enforcement official, who spoke on the condition of anonymity, said federal agents also were reviewing adult pornographic files found on Luna's Justice Department computer that appeared unrelated to his caseload, which had included the prosecution of online child pornography and predators.

As authorities were compiling extensive information about Luna's personal life and his final hours, they

🗨 Talk about it
✉ E-mail it
🖨 Print it
✉ Contact us

PHOTOS
📷 **Jonathan P. Luna is believed to have driven this car**
(FBI)
Dec 8, 2003



📷 **Investigators visited this service station**
(AP photo)
Dec 8, 2003

IN DEPTH
📖 **Full coverage of Luna murder case**



continued searching for a suspect in his killing.

Top officials who met yesterday to discuss the case said in a statement that the FBI, U.S. Marshals Service and Pennsylvania State Police would continue to jointly investigate and that no jurisdictional decisions are possible "until all the facts and circumstances are known."

Law enforcement sources had indicated over the weekend that the investigation likely would be handled as a local murder case in Lancaster County, Pa., where Luna's body was found shortly before dawn Thursday.

He had been stabbed 36 times, beaten and left face down in a shallow creek. Among Luna's wounds were injuries to his genital area, law enforcement sources have said.

ALSO SEE
**Maryland**
> Anne Arundel
> Carroll
> Harford
> Howard
**Columnists**
> Gregory Kane
> Michael Olesker
> Dan Rodricks
**Features**
> Education Beat
> On the Bay
> Police Blotter
> Political Game
**More coverage**
> Education
> Obituaries
> Traffic
> Weather
> Lottery

Investigators believe that Luna's death was the result of a personal relationship that turned violent, not a random crime or in retaliation for his work - reducing the likelihood that his death would be prosecuted as a federal crime.

But the case remains a sensitive and painful one for federal prosecutors in Baltimore.

At the downtown courthouse yesterday, many employees from the office wore black ribbons on their lapels; flags outside the building flew at half-staff.

"The investigating agencies and prosecutors' offices continue to work jointly to find the person or persons responsible for this crime," DiBiagio and Lancaster County District Attorney Donald R. Totaro said in a statement.

Both prosecutors have declined to comment further on the investigation. But last night DiBiagio rejected any suggestion that Luna had been at risk of being fired.

"His job was not in jeopardy in any respect," DiBiagio said.

He said Luna's prosecution earlier this year of a rare pornography-production case was recognized by the office as "one of the most significant prosecutions of 2003."

B
ch
a
Bal
Mu

Click t

sun
on

Sell

ADVE

Cont



conce
festiva
sportir
and m
month
contes
Medie

Even
Pron



events
spons
The B
Sun a

DiBiagio also said Luna had expressed no concerns about his job security at an employee review meeting in June and had no reason to: None of Luna's supervisors "ever indicated we should take any ... action against him."

Luna, a married father of two who joined the federal prosecutor's office four years ago, was stylish and energetic and showed promise as a young lawyer.

The Bronx, N.Y., native and graduate of the University of North Carolina law school had previously worked as an assistant district attorney in Brooklyn, N.Y., and served as a staff attorney at the Federal Trade Commission. He was an associate at the Washington law firm of Arnold and Porter in 1993 and 1994.

Luna's parents, Paul D. and Rosezella Luna, have said they believe his death was related to his work prosecuting violent criminals and have steadfastly rejected suggestions that he had affairs or money problems.

As an assistant U.S. attorney, Luna handled a range of cases, but among his more notable was the prosecution this year of a Navy physicist who was accused of trying to seduce a teen-age girl on the Internet, but who claimed he was only engaged in online fantasy.

Late last year, Luna won convictions in a string of violent Baltimore County bank robberies in a curious trial that produced its own mystery: At the end of the trial, authorities discovered that more than $36,000 in cash disappeared somewhere between the courtroom and the government storage area used to hold sensitive evidence during trials. That loss was never solved.

In recent months, lawyers who had worked with Luna said that he appeared to be distracted and disorganized. Three legal sources, who spoke on the condition of anonymity, said Luna had indicated that he was exploring career options outside of the prosecutor's office.

When he disappeared last week, Luna was concluding a drug conspiracy trial in U.S. District Court against two Baltimore men who were accused of running a violent heroin ring from the **Hampden** recording studio of their upstart rap music label, Stash House Records.

Late Wednesday, Luna had told a defense attorney in the case that he was returning from home to the federal courthouse to complete paperwork for expected plea deals in the case the next morning. He left the courthouse about 11:30 p.m., according to building records, and his body was found about six hours later in rural Brecknock Township, Pa.

baltim
includ
Talk.

**Spec
secti**



sectio
UNISC

Investigators have built a detailed timeline of Luna's travels during those hours, according to law enforcement sources. Luna is believed to have set out on the trip willingly and headed toward Philadelphia - not Lancaster County - using an EZ Pass card to slip through toll booths in Delaware and Pennsylvania and making at least two stops: one to withdraw money at an ATM and another where he used a credit card to buy gasoline in King of Prussia, Pa., a busy retail center west of Philadelphia.

Authorities were looking for signs of any other activity on Luna's credit or bank cards.

Over the weekend, federal agents asked Luna's family about other trips he might have taken in recent months to the area where his body was found.

They also were examining messages posted by someone using the name Jonathan Luna on Internet dating sites. The author of the messages, from April 1997, described himself as a discreet, 31-year-old married black man seeking a white female sexual partner and indicated a preference for blondes and redheads.

A law enforcement official said yesterday that investigators were closely examining relationships that Luna had with at least two women. The official did not elaborate on the nature of the relationships.

In Lancaster County, FBI agents have questioned hotel operators near the crime scene about any unusual activity the night of Luna's disappearance.

The agents have asked specficially about unusual activity in hotel parking lots and asked to review guest registers and any outdoor surveillance cameras.

Agents made similar stops at gas stations near the crime scene and along the route that authorities think Luna traveled, according to business operators and law enforcement sources.

Sun staff writers Gus G. Sentementes and Lynn Anderson contributed to this article.

*Copyright © 2004, The Baltimore Sun* | *Get home delivery*

💬 Talk about it    ✉ E-mail it    🖨 Print it    ✉ Contact us

baltimoresun.com

Feb. 13, 2004

http://www.baltimoresun.com/news/local/bal-md.luna13feb13,1,278209.story

# Search uncovers Luna's penknife

## Federal prosecutor, 38, was likely stabbed with it, investigators believe

By Gail Gibson
Sun Staff

February 13, 2004

Authorities probing the mysterious death of Baltimore federal prosecutor Jonathan P. Luna now think the young lawyer likely suffered from stab wounds inflicted with his own pocketknife and are re-examining financial records that may shed more light on the final months of Luna's life.

In a recent recanvassing of the rural Pennsylvania field where Luna's body was found, investigators found a penknife that they believe caused his wounds, according to two federal law enforcement sources. They also said that investigators believe the pocketknife is the one that Luna regularly carried.

Luna was stabbed 36 times and found Dec. 4 facedown in a shallow creek in rural Lancaster County, Pa., where authorities said he drowned. His Honda Accord was nearby, its engine running.

It was not known yesterday whether authorities found fingerprints or blood on the knife, or why the weapon was not discovered during an extensive search of the scene on the day Luna was found.

The discovery of the knife comes as investigators also have sought help analyzing medical and psychological evidence from a well-regarded military forensics unit as they struggle with a new, competing theory about one of the most basic questions in the case: whether Luna was the victim of a homicide or suicide.

In FBI reports over the past month, authorities have raised the possibility that Luna, 38, could have killed himself, according to three law enforcement sources who spoke with The Sun on condition of anonymity. The controversial theory has met sharp skepticism internally, however, by a number of investigators who maintain that the evidence points to homicide.

Officials with the FBI's Baltimore field office, which has headed the investigation, have declined to comment on any of the theories that authorities are pursuing to solve the mystery of Luna's death.

"All I can say is the investigation continues," said Special Agent Barry Maddox, a spokesman for the office.

Luna's boss, Maryland U.S. Attorney Thomas M. DiBiagio, has not commented on the investigation since the night that it began, when he said preliminary evidence suggested Luna had been murdered. Vickie E. LeDuc, a spokeswoman for the prosecutor's office, also declined to comment, as has Luna's family.

The energetic and well-liked young prosecutor, who was married and had two young sons, was due in federal court in downtown Baltimore to conclude a drug case on the day that he was found dead. But investigators found no evidence that his death was related to his work, and instead have closely combed Luna's personal life for clues.



## Loan application

In recent days, investigators have again turned their attention to the unsolved disappearance of about $36,000 introduced as evidence in a bank robbery trial that Luna prosecuted in September 2002. Authorities have not linked the missing cash to Luna or to his death, but investigators now are examining a loan application that Luna filled out online about the time of the trial.

The loan application was for about $30,000, and it was canceled not long after the period when the evidence money was discovered missing, according to a federal law enforcement source. Authorities have determined that at the time of his death, Luna had credit card debts of about $25,000 -- and that he had as many as 16 credit card accounts, some that he held without his wife's knowledge.

In addition to financial troubles, Luna also had felt that he was on the outs with his supervisors in the U.S. attorney's office, where he had worked for four years. Several legal sources have said that Luna was concerned he might have to change jobs. DiBiagio has rejected any suggestion that Luna was at risk of being fired.

The highly sensitive question of whether Luna could have killed himself is at the center of a debate among investigators about the direction of the case, as it stretches into a third month with no arrests. To better develop the theory, investigators have asked the Armed Forces Institute of Pathology to examine medical and psychological evidence in the case.

A spokesman for the institute referred all questions about the Luna case to the Baltimore FBI office.

Autopsy findings by the medical examiner in Lancaster County, Pa., have not been made public, and forensic pathologist Dr. Wayne K. Ross, who performed the autopsy, has refused to discuss the case. However, the county's then-coroner, Dr. Barry Walp, said in the first days of the investigation that Luna had suffered a number of shallow "prick" marks on his chest and neck in addition to several deeper, more serious stab wounds.

While rare, there are some high-profile instances of suicides by stabbing, cases frequently marked by so-called "hesitation wounds" that barely penetrate the skin. In 1999, Army officials ruled that a National Guard captain found dead at a Kentucky base with 26 stab wounds to the neck and chest was a suicide, a finding that was disputed by the soldier's family.

More recently, the stabbing death in December of Oscar-nominated singer-songwriter Elliott Smith -- initially thought to be a suicide -- remains an open question after the Los Angeles coroner's office said it could not determine whether stab wounds to Smith's chest were most likely inflicted by him or by someone else.

If authorities conclude that Luna's death was a suicide, the finding could open investigators to allegations that they simply failed to solve the high-profile case.

Already, the case has been marked by competing jurisdictional issues between authorities in Pennsylvania and Maryland. In addition, officials in Washington are investigating whether some

supervisors in the FBI's Baltimore office overreached in questioning a female agent in connection with the Luna case, a law enforcement source has told The Sun.

**Internal probe**

The Justice Department's Office of Professional Responsibility has opened an investigation into whether supervisors improperly questioned an agent who had worked on several cases with Luna about her personal life and told her to turn over her computer for inspection, the source said.

The internal investigation was first reported Wednesday evening by CBS News.

A federal law enforcement official said yesterday that there has been no finding in the internal probe and emphasized that investigators never considered the agent a suspect in Luna's death -- "nor have they developed any suspect," the source said.

In Luna's case, sources have described evidence that appears to run counter to a suicide theory. Officials have said that some of Luna's wounds appear to be defensive and have said that authorities found evidence of a second blood type in Luna's Honda Accord, possibly from an attacker.

Investigators also found blood on the Pennsylvania Turnpike toll ticket that they believed was turned in in rural Ephrata, Pa., when Luna's car exited the highway on the night he was killed. The ticket suggested to investigators the possibility that someone other than Luna was driving the car when it entered and left the Pennsylvania Turnpike because Luna's car had an EZ Pass card, something a driver unfamiliar with the vehicle might not have known.

In the two months since Luna's death, agents also have pored over Luna's financial records, computer files, phone logs and personal contacts in his Palm Pilot, but none of the information has led authorities to a potential suspect.

*Copyright © 2004, The Baltimore Sun*

USCA4 Appeal: 12-394    Doc: 2-2    Filed: 12/14/2012    Pg: 47 of 49

# Money stolen, found and missing again

*Cash: Up to $38,000 used as evidence in a bank robbery trial has disappeared, officials say.*   "D"

**SUN STAFF**

**GAIL GIBSON**

PUBLISHED ON OCTOBER 3, 2002
© 2002- THE BALTIMORE SUN

As they wrapped up a two-week bank robbery trial in U.S. District Court in Baltimore, federal authorities discovered another possible crime - some key evidence, more than $36,000 in cash, had disappeared.

FBI officials confirmed yesterday that agents are investigating what happened to money used as evidence in the trial of Nacoe Ray Brown, who was convicted last week in a string of violent bank robberies in Baltimore County. Special Agent Barry A. Maddox, an FBI spokesman, declined to discuss the evidence investigation in detail or say how much money is missing. But law enforcement sources said that $36,000 to $38,000 was gone and that FBI agents had interviewed numerous courthouse employees this week.

The money was determined to be missing as attorneys packed up after a jury had returned its verdict against Brown last Thursday, said U.S. District Judge Andre M. Davis, who presided over the trial and was astounded by the discovery.

Davis said investigators have indicated that the money apparently was not taken from his courtroom, but that it likely was lost somewhere between the courtroom and government storage used to hold sensitive evidence during trials.

"My understanding is it wasn't taken out of the courtroom, and that gives me a very narrow measure of relief," Davis said. "The bureau is undergoing a very thorough, professional investigation, and we can just await the outcome."

Officials with the U.S. attorney's office did not respond yesterday to requests for comment.

Federal prosecutors and the FBI agents assigned to the case would have been directly responsible for the money. Such evidence, along with items such as guns and drugs, typically is kept locked in a secure area except for the brief period when it is introduced at trial.

The **missing money** provided odd punctuation to a high-profile bank robbery case with its own curious twists.

Brown, 34, of Baltimore, was charged with another man in connection with four Baltimore County robberies last year that gained attention for the level of violence, the amount of money taken and the robber's many disguises. In one robbery, the gunman wore hospital scrubs and a stethoscope; in another, a suit and black fedora, according to an affidavit by the FBI's lead investigator in the case, Special Agent Anthony M. Campano.

Prosecutors said Brown was the holdup man in four robberies that netted more than $450,000. He was convicted on three counts of bank robbery; jurors were deadlocked on a fourth count.

The other defendant, Kevin L. Hilliard, pleaded guilty to his role in one robbery and testified against Brown at the trial. Hilliard said that Brown told him God had directed him in a vision to rob banks as a way to fund his struggling gospel dinner theater in downtown Baltimore. The theater, Shekinah's Place on Guilford Avenue, closed.

Court records show that it was during a search of Hilliard's home that FBI agents found a safe containing about $68,000 in cash, some of it in wrappers from banks that had been robbed.

A list of government exhibits introduced at trial makes two references to cash - one exhibit was listed as "Money from Hilliard's safe;" another was identified as "Money recovered from Hilliard on arrest."

A stipulated agreement that all exhibits in the case had been returned was signed on the last day of the trial by each of the attorneys in the case - Assistant U.S. Attorneys Jonathan P. Luna and Jacabed Rodriguez-Coss and defense attorney Kenneth W. Ravenell.

Ravenell said yesterday that at the trial, government lawyers asked Hilliard to identify the cash seized from his safe as coming from the bank robberies. Ravenell said the money was heat-sealed in two or three separate plastic bags and that each one was extremely bulky because the denominations were relatively small.

The missing bag of money contained as much as $38,000, apparently in $20 bills, according to law enforcement sources close to the investigation.

Ravenell said the money was in the courtroom for only the short period when it was identified by Hilliard and introduced as evidence. After that, he said the evidence apparently was taken to a secure area by government agents or attorneys, who typically wheel case files and evidence boxes through the courthouse on rolling carts. "These were not like little stacks of ... hundred-dollar bills," Ravenell said. "It's not something that, in my opinion, is just going to fall off the cart in the hallway and no one would notice."

Ravenell said he had not been interviewed by FBI agents and learned about the missing evidence during an unrelated appearance in Davis' courtroom

this week. He said the evidence probe would not affect his client's case or sentencing, which is scheduled for December 13.

"The money was there during the trial," Ravenell said. "What they did with it after, I have no idea."