1    I think we all know what you're referring to by the

2    White Accounting records. Those records were not admitted into

3    evidence. You'll recall that, in fact, we had sort of an

4    exchange about the documents and all of that, when certain

5    documents were shown to Agent Campano. Not one of those

6    records was moved into evidence in this case. So, they are not

7    a part of the evidence. And so, as I said a moment ago, any

8    document, whether or not it was referred to here in the

9    courtroom, if it was not admitted into evidence, it is not

10   available for your consideration, you should not consider it,

11   and you should not speculate about any such document or other

12   exhibit.

13        We have sent in to you, with a couple of exceptions,

14   all of the evidence that was admitted in this case. We didn't

15   send in the money, we didn't send in the exhibit which was

16   described as the pellet gun, and we didn't send in the jewelry

17   that was identified. I think, frankly, the reason we didn't

18   send in those exhibits is pretty obvious. There are certain

19   exhibits that we simply don't, under court procedures, allow

20   out of the possession of the United States Attorney's Office

21   and the FBI.

22        If you need to examine any exhibit that was not sent

23   in to you, as I indicated with respect to the CD-Rom that

24   contained certain images, if you want to examine any evidence

25   that was admitted but not sent in, simply send us a note that

Page 1572

1    be excused.  I have a few additional instructions for you.

2    First, of course, you'll recall that your first order of

3    business in the jury room will be to select or elect, however

4    you choose to do it, a foreperson.  The foreperson selected by

5    you will earn no extra pay but will simply be your spokesperson

6    here in court when you deliver your verdict, and he or she will

7    preside over your deliberations.  So, you make your decision

8    promptly upon going into the jury room.

9            Within just a few minutes after you go into the jury

10   room, we're going to send in all of the evidence and copies of

11   my instructions as well as the verdict sheets.

12           If at any point hereafter you need to communicate with

13   us about any matter, you must do so only in writing.  If you

14   have a question or an observation or any other matter you need

15   to communicate with us about, simply write out your question or

16   your observation and knock on the door.  The bailiff will be

17   here in the courtroom at all times during your deliberations,

18   so if you need to communicate with us, just knock on the door,

19   and he'll take the note and bring it to me, and we'll get back

20   to you promptly with an answer if it's a question.

21           I may send in a written response to a question, if you

22   send out a question, or, alternatively, we may bring you back

23   into the courtroom, in the jury box, and I will answer your

24   question here in open court.

25           Now, we haven't arranged and probably can't make

Sharon Cook, Official Court Reporter, U.S. District Court

1   use of mobile-communication devices during your deliberations.

2   So, please disable your pagers and cell phones.  Make no calls,

3   and respond to no calls during your deliberations.

4           The jury is excused to begin its deliberations.

5           (At 10:33 a.m., the jury left the courtroom to

6           commence deliberations.)

7           THE COURT:  I assume that all the exhibits are in

8   order?

9           MR. LUNA:  We're going to meet with Ms. Arrington.

10          THE COURT:  Please.  Ms. Arrington and I had a very

11  bad experience recently, where it took over an hour to get the

12  exhibits together?

13          MR. LUNA:  We're not going to do that.

14          THE COURT:  Frankly, I would prefer that you not wait

15  until you've gone through all of them before you start sending

16  them in.  Get through as many as you can within the next couple

17  of minutes, and then send those in, and then finish looking at

18  whatever you need to look at, and send those in.  They don't

19  have to all go in at the same time.

20          MR. LUNA:  Yes, Your Honor.

21          THE COURT:  Please take care of that expeditiously.

22          Mr. Ravenell, did you have a question?

23          MR. RAVENELL:  Your Honor, I was just conferring with

24  Ms. Arrington as to whether the exhibit was found that we

25  couldn't find yesterday and she told me yes.

1    as well.

2             THE COURT:  Very well.

3             MR. RAVENELL:  If I may inquire, Your Honor.

4    Do you have that draft finalized?

5             MS. RODRIGUEZ-COSS:  Not quite.

6             MR. RAVENELL:  I'll wait until you get that then.

7             THE COURT:  Okay.  Thank you all.

8    We're in recess.

9             (At 10:36 a.m., the recess commenced.)

10            (At 11:23 a.m., the following colloquy took place.)

11            THE COURT:  We have a note from the jury that reads as

12   follows:

13            1. Jurors request a ruler marked to 16th of an

14               inch and a calculator.

15

16            MR. RAVENELL:  I'm sorry.  I didn't hear that.

17            THE COURT:

18            1. Jurors request a ruler marked to 16th of an

19               inch and a calculator.

20       And then:

21            2. May we take the stocking off of Exhibit 1?

22       It seems to me that the easiest answer is, of course,

23   they can have a ruler.  I have one here that I'm happy to send

24   in.

25       But, obviously, I thought I need to confer with

1  counsel as to these other matters. I think I know the answer

2  to Number 2. We don't want the exhibit disturbed in a way that

3  would be required to remove the stocking. Frankly, I can't

4  imagine why they need to take the stocking off.

5         MR. RAVENELL: There's no evidence that it was ever

6  off.

7         THE COURT: No.

8         The exhibit was admitted in exactly the condition in

9  which it was seized; right?

10         MR. LUNA: That is correct.

11         THE COURT: I mean, there's a little hole in the

12  stocking, as I recall, that was used to affix the exhibit

13  sticker.

14         MR. LUNA: Right.

15         THE COURT: So, the answer to that is no.

16         How do counsel feel about a calculator?

17         MR. RAVENELL: I don't object, Judge.

18         MR. LUNA: The government doesn't object to that.

19         THE COURT: Okay. Very good.

20         So, why don't I do this easily. I'll send in a

21  written response on my letterhead:

22                No, the exhibit may not be disturbed, and,

23                therefore, the covering may not be removed from

24                Exhibit 1.

25         MR. RAVENELL: Your Honor, what's the official time on

Page 1580

1    that note?

2         THE COURT:  It's 11:05.

3         MR. RAVENELL:  Thank you.

4         THE COURT:  It's available to examine if you want to.

5         MR. RAVENELL:  No, no.  We were here when it came out.

6         THE COURT:  Okay.  We're in further recess.

7         (At 11:27 a.m., the recess commenced.)

8         (At 12:05 p.m., the following colloquy took place.

9         The defendant was not present.)

10        THE COURT:  Counsel, we're back on the record in

11   United States of America v. Nacoe Ray Brown.  Counsel are

12   present.  The defendant is not present.  The Court has received

13   a couple of additional notes, but I don't think we need the

14   defendant to discuss this -- that is to say, I don't think that

15   Mr. Ravenell is going to need to confer with his client, but if

16   he should need to or desire to, I'll certainly not make a final

17   determination as to how to respond to these inquiries until he

18   has had a chance to confer with Mr. Brown.

19        MR. RAVENELL:  That's fine, Your Honor.

20        THE COURT:  At 11:45 a.m., the following note came out

21   of the jury room, while I was involved in that sentencing you

22   all just saw me conclude.

23             Can the jury have a list of all the evidence

24             entered?

25        Did we send in the exhibit lists with the evidence?

Sharon Cook, Official Court Reporter, U.S. District Court

Page 1582

1      THE COURT:  Yes.

2      MR. RAVENELL:  The numbering I have no problem with,

3  but there may be something on the descriptions.

4      THE COURT:  Yes.  Okay.

5      Let's go to the next note, which is related to that.

6  This note came out at 12:05:

7          1. Can the jurors have all the evidence

8             presented, primarily the White Accounting

9             records?

10         2. Was there a second hands-free device entered

11            into evidence?

12     (There was then a knock on the door from the jury room)

13     THE COURT:  Obviously, I need to bring the jury back

14  into the courtroom.  I normally tell them that there were

15  exhibits that were marked for identification or otherwise

16  mentioned that were not admitted into evidence and that the

17  only ones they will get are the ones that are admitted into

18  evidence, and I failed to do that in this instance, so I think

19  I should probably, at a minimum, bring them back into the

20  courtroom and tell them that.

21     As we've been sitting here, as you all just observed

22  and heard, there was a knock at the door, so now another note

23  has come out.  It says:

24         Can we have the easel, magic markers, and

25            masking tape?

Sharon Cook, Official Court Reporter, U.S. District Court

1        Belinda, we need Mr. Brown to be brought down.

2        I'm going to bring the jury back into the courtroom

3    and essentially answer all of these questions in one

4    consolidated response.

5        I'm going to tell them that we are preparing a

6    sanitized copy of the exhibit list, that it's going to take a

7    bit of time, but we will get it into them.

8        And I'm going to tell them that they cannot have any

9    exhibits that were marked only for identification, and that, in

10   fact, they have all of the exhibits that have been admitted as

11   evidence in the trial.

12       Is that literally true, by the way?

13       MS. RODRIGUEZ-COSS:  Yes.  Except for 58, which is

14   ready now.

15       THE COURT:  But all the money has gone in, and so

16   forth?

17       MS. RODRIGUEZ-COSS:  No, Your Honor.

18       THE COURT:  I didn't think you'd send in the money.

19   What money did you not send in?

20       MS. RODRIGUEZ-COSS:  We didn't send in any of the

21   money.

22       THE COURT:  None of the money.  Okay.

23       MS. RODRIGUEZ-COSS:  Also, we didn't send in the

24   pellet gun, and we didn't send in the pellets.

25       THE COURT:  Nor should you.

1      Belinda, can you call the Marshals and ask them to

2   bring Mr. Brown down.

3      MR. RAVENELL:  Your Honor, did they ask for the White

4   Accounting records?

5      THE COURT:  Right.  The thing we had the fight about,

6   which you totally abandoned.

7      MR. RAVENELL:  Well, I abandoned it because I didn't

8   have Ms. Dana Lewis as a witness.

9      THE COURT:  Well, for whatever reason, you abandoned

10  it.

11     MR. RAVENELL:  Right.  I agree they were not

12  submitted.  It wasn't like I didn't want to put them in, Your

13  Honor.

14     THE COURT:  So, is Exhibit 58 now agreed?

15     MS. RODRIGUEZ-COSS:  Yes, sir.  Counsel has had an

16  opportunity to review the transcription, and, to the best of

17  our ability, it's an exact transcription of that letter except

18  for the phrase that we agreed would be deleted.

19     THE COURT:  Okay.  So, what I will tell the jury then

20  is that the Exhibit 58 they're going to get is not the original

21  letter, but it is a retyped version of the letter that will be

22  easier for them to read, and that they may treat this as if it

23  were actually the letter that she read.  Read from.  She didn't

24  read the entire letter.

25     MR. RAVENELL:  Your Honor, if I could just step

Page 1587

1    recall is the toy gun that was entered into evidence early in

2    the case.

3            After conferring with Mr. Ravenell and government

4    counsel, the Court sent in a written response, as I indicated I

5    would, and I sent in the calculator and the ruler as requested

6    by the jury.

7            As to Government's Exhibit 1, the toy pistol, I

8    indicated to the jury that exhibits could not be disturbed, and

9    that, therefore, they were not allowed to remove the covering

10   from that exhibit.

11           In very short order thereafter, we received a series

12   of additional notes from the jury, and essentially those

13   notes -- I'm going to read them when the jury comes into the

14   courtroom in a moment, so you'll hear what the notes actually

15   say, but essentially those notes are asking about exhibit

16   lists, whether they can get exhibit lists and whether or not

17   certain items which were mentioned during the trial, in

18   particular the so-called White Accounting records, were

19   admitted into evidence, and whether they can have them, and

20   also whether a second hands-free device was entered into

21   evidence.

22           They've also reiterated a request for an easel, magic

23   markers, and masking tape, all of which material we will

24   provide to them.

25           And then, finally, Mr. Ravenell and government counsel

Page 1588

1   have reached agreement on a redacted copy of the Carter

2   letter -- that is, the letter from Mr. Brown to Ms. Carter,

3   which was read in part by Ms. Carter during trial.  By

4   agreement of counsel, the government has arranged to have that

5   letter typed on a word processor and printed out.  Mr. Ravenell

6   has reviewed that exhibit, and it has been marked as

7   Government's Exhibit Number 58, leaving out the objectionable

8   portion.

9          So, I'm going to advise the jury that this exhibit

10  should be treated by them as the original of that letter that

11  was read from by Ms. Carter, that it was typed because it will

12  be easier to read if they choose to read it, and, furthermore,

13  that neither the money, the exhibit described as a pellet gun,

14  nor any of the pellets that were identified are being sent into

15  the jury room pursuant to normal Court policy.

16         Is there anything I left out, Ms. Rodriguez-Coss or

17  Mr. Luna?

18         MR. RAVENELL:  I was just checking with Mr. Luna as to

19  whether the pellets actually went in, Your Honor.

20         MR. LUNA:  The actual pellets did go in, and the gas

21  canisters that go with the pellet gun did go in.  The gun did

22  not go in.

23         THE COURT:  Not the gun.

24         MS. RODRIGUEZ-COSS:  The other thing we also have,

25  Your Honor, is the jewelry.  We still have that.  So, I don't

Sharon Cook, Official Court Reporter, U.S. District Court

1    know if the Court wants to tell them that if they want to look

2    at it, we can bring it into the courtroom.

3              MR. LUNA:  We have no objection to bringing the

4    jewelry in.

5              THE COURT:  Of course.  If they want to examine any

6    evidence that wasn't sent in, they'll request it, and they'll

7    do that in the courtroom.

8              MR. LUNA:  Right.

9              THE COURT:  Anything further, Mr. Ravenell?

10             MR. RAVENELL:  Nothing else, Your Honor.

11             THE COURT:  Okay.  Does anybody want me to ask them

12   why they wanted the calculator?

13             MR. RAVENELL:  I don't think we should be inquiring,

14   Judge.

15             MS. RODRIGUEZ-COSS:  Absolutely not.

16             MR. RAVENELL:  We may get an answer we don't want to

17   hear.

18             THE COURT:  I'm sure we would.  That none of us want

19   to hear.

20             (At 12:22 p.m., the jury returned to the courtroom.)

21             THE COURT:  Good afternoon, ladies and gentlemen.

22             Since you retired to begin your deliberations, as I

23   presume all of you are aware, you have sent us a series of

24   notes, questions, and comments.  I answered an earlier note in

25   writing, and then, in the meantime, additional notes have come

1    out.  I thought it might be most efficient and most useful and

2    helpful to you if we simply had this brief reconvening of court

3    so that I could respond to your written questions.

4              First of all, the earlier note asked for a calculator

5    and a ruler with 16th-inch hatch marks, and you inquired about

6    whether you could remove the covering from Government's Exhibit

7    Number 1.

8              As you are aware, we sent in to you the ruler and the

9    calculator, and that's fine, but as I indicated in my written

10   communication to you, it is not appropriate ever to disturb an

11   exhibit that has been admitted into evidence, and so it would

12   not be appropriate to disturb, remove, cut, or otherwise damage

13   any of the exhibits.  In particular, the covering on

14   Government's Exhibit Number 1 should not be removed.

15             In the meantime, we received these notes, and I'm

16   going to answer them somewhat one at a time, but I also have

17   some general instructions that, in fact, I usually give the

18   jury and just simply failed to do so in this instance.  So, let

19   me start there.

20             The course of the trial involved mention of, and

21   perhaps on one or two occasions the marking of, certain items

22   as exhibits.  However, the items that have not been sent in to

23   you, with certain exceptions that I'll come to, were marked for

24   identification only.  So, where an exhibit or proposed exhibit

25   was marked for identification only, that means it was not

1  admitted into evidence.  And so, any document or other exhibit

2  that was marked for identification during the trial, but not

3  formally admitted into evidence, is not available to you

4  because it's not a part of the evidence of the case.

5          Now, you've asked in one of your notes:

6              Can the jury have a list of all the evidence

7              entered?

8          We are working on preparing an exhibit list, both for

9  the government's exhibits and the defense exhibits.  That will

10 take a few additional moments.  We're going to send in a clean

11 copy of the exhibit list, but as I say, that will take a few

12 moments.  The exhibit list in some parts contain certain

13 descriptions that you might or might not find helpful, and so

14 we're going to send that list in to you so that you can use it

15 to try to keep track of the exhibits.

16          So, that's one question.

17          You also asked:

18              Can we have the easel, magic markers, and

19              masking tape?

20          I assure you can.  I think we pretty much have that

21 for you now, and it should be brought in to you very, very

22 shortly after I excuse you.

23          There's also this question:

24              Can the jurors have all the evidence presented,

25              primarily the White Accounting records?

1   I think we all know what you're referring to by the

2   White Accounting records.  Those records were not admitted into

3   evidence.  You'll recall that, in fact, we had sort of an

4   exchange about the documents and all of that, when certain

5   documents were shown to Agent Campano.  Not one of those

6   records was moved into evidence in this case.  So, they are not

7   a part of the evidence.  And so, as I said a moment ago, any

8   document, whether or not it was referred to here in the

9   courtroom, if it was not admitted into evidence, it is not

10  available for your consideration, you should not consider it,

11  and you should not speculate about any such document or other

12  exhibit.

13      We have sent in to you, with a couple of exceptions,

14  all of the evidence that was admitted in this case.  We didn't

15  send in the money, we didn't send in the exhibit which was

16  described as the pellet gun, and we didn't send in the jewelry

17  that was identified.  I think, frankly, the reason we didn't

18  send in those exhibits is pretty obvious.  There are certain

19  exhibits that we simply don't, under court procedures, allow

20  out of the possession of the United States Attorney's Office

21  and the FBI.

22      If you need to examine any exhibit that was not sent

23  in to you, as I indicated with respect to the CD-Rom that

24  contained certain images, if you want to examine any evidence

25  that was admitted but not sent in, simply send us a note that

Page 1593

1    you want to examine whatever it is, and we will bring you back

2    into the courtroom, as you are now, and we will play the

3    CD-Rom, or we will allow you to examine that exhibit, including

4    passing it among yourselves, if that's what you desire to do.

5         So, you have everything in the jury room with those

6    exceptions, and one additional exception that I'm going to

7    mention now.  You will recall that during the trial there was a

8    letter identified as a letter sent to Ms. Carter from Mr.

9    Brown.  And Ms. Carter, you will recall, read certain excerpts

10   from that letter.

11        Counsel for the parties have arranged to have that

12   letter typed, and you will remember that the original letter

13   was not typed, so that you are better able to read it.  If you

14   choose to read the letter, the letter has now been typed, and

15   it is marked as Government's Exhibit Number 58.  You should

16   regard this as an original exhibit.  Even though what Ms.

17   Carter read from was not the typed version, but was the

18   handwritten version of that document, this typed version is

19   agreed by the parties to be an exact duplicate of the actual

20   document.  So, you may regard this as the actual exhibit, and

21   we're going to send this in to you so that you will then have

22   all of the exhibits except the exhibits that I mentioned -- the

23   pellet gun, the jewelry, and the money.

24        I understand that the actual pellets and the CO

25   canisters that were a part of that pellet exhibit have been

Sharon Cook, Official Court Reporter, U.S. District Court

1    sent in to you, so you can look at that if you choose, but the

2    actual pellet gun has not been sent in.

3            You asked the question:

4                Was there a second hands-free device entered in

5                evidence?  Can we have it if there was?

6            I think I've already answered that question.  You have

7    all of the items, photographs and other exhibits, that were

8    admitted into evidence with the exceptions of the ones I

9    mentioned, and there is no other exhibit that was admitted into

10   evidence that we're withholding from you.

11           I believe that that answers all of the last series of

12   questions.  I believe your lunch will be here very, very

13   shortly.  In the meantime, we have the TV monitor, the VCR

14   player, the easel, the magic markers, and the masking tape

15   available to you.  We'll get those in, together with Exhibit

16   58, very promptly.

17           As I say, it's going to take just a few moments to

18   finalize the exhibit lists, and then we'll send those in to

19   you, also.

20           Okay.  I see that there's another note that's coming

21   from the jury even as we sit here, and that's fine.  That's

22   fine.  As I told you, you should only communicate to us in

23   writing, and I appreciate your scrupulous adherence to that

24   instruction.

25           As you can see, so that we have a good record of

<u>AFTERNOON SESSION</u>

1
2          (At 1:45 p.m., the following colloquy took place out
3          of the presence of the jury.)
4          THE COURT:  Okay.  We're back on the record.  Counsel
5   and the defendant are present.
6          I understand the CD-Roms were sent out, as I requested
7   the jury.
8          Could you just run through it one time, please.  Are
9   you going to do it, Mr. Luna, or will the Agent?
10         MR. LUNA:  I can do it, Your Honor.  As I understand
11  it, the jury has requested the video.  In addition to the
12  video, there's also stills.  I was just going to play the
13  video.
14         THE COURT:  Well, wait a minute.  The jury --
15  actually, I've gotten another note since you all left.  I don't
16  know if you know that.
17         The other note said:
18              Can the jury see the CD-Rom of First Mariner's
19              from March robbery?
20         MR. LUNA:  Okay.  That's the entire CD-Rom.
21         I just want the record to reflect, and you'll see it,
22  I'll show you the directory of the CD-Rom, it has black and
23  white stills, color stills, black and white video, and color
24  video.  I just wanted to let the Court know that.  I don't
25  anticipate that taking a super long time to show, but I just

baltimoresun.com    (G)

http://www.baltimoresun.com/news/local/bal-te.md.luna09dec09,1,6530659.story

# Slain prosecutor's relationships with women examined

## Investigation focusing on personal life of Luna; Possible financial, work troubles

By Gail Gibson
Sun Staff

December 9, 2003

Authorities working to solve the mysterious slaying of a Baltimore federal prosecutor are examining his personal relationships with women and possible financial and work-related problems, a law enforcement official said yesterday.

At the time of his death, Jonathan P. Luna had about $25,000 in credit card debt, the official said.

Other sources said Luna, 38, had expressed concern in recent weeks that he had fallen out of favor with his supervisors at work and might have to change jobs - a notion Maryland U.S. Attorney Thomas M. DiBiagio flatly denied last night.

The law enforcement official, who spoke on the condition of anonymity, said federal agents also were reviewing adult pornographic files found on Luna's Justice Department computer that appeared unrelated to his caseload, which had included the prosecution of online child pornography and predators.

As authorities were compiling extensive information about Luna's personal life and his final hours, they continued searching for a suspect in his killing.

Top officials who met yesterday to discuss the case said in a statement that the FBI, U.S. Marshals Service and Pennsylvania State Police would continue to jointly investigate and that no jurisdictional decisions are possible "until all the facts and circumstances are known."

Law enforcement sources had indicated over the weekend that the investigation likely would be handled as a local murder case in Lancaster County, Pa., where Luna's body was found shortly before dawn Thursday.

He had been stabbed 36 times, beaten and left face down in a shallow creek. Among Luna's wounds were injuries to his genital area, law enforcement sources have said.

Investigators believe that Luna's death was the result of a personal relationship that turned violent, not a random crime or in retaliation for his work - reducing the likelihood that his death would be prosecuted as a federal crime.



But the case remains a sensitive and painful one for federal prosecutors in Baltimore.

At the downtown courthouse yesterday, many employees from the office wore black ribbons on their lapels; flags outside the building flew at half-staff.

"The investigating agencies and prosecutors' offices continue to work jointly to find the person or persons responsible for this crime," DiBiagio and Lancaster County District Attorney Donald R. Totaro said in a statement.

Both prosecutors have declined to comment further on the investigation. But last night DiBiagio rejected any suggestion that Luna had been at risk of being fired.

"His job was not in jeopardy in any respect," DiBiagio said.

He said Luna's prosecution earlier this year of a rare pornography-production case was recognized by the office as "one of the most significant prosecutions of 2003."

DiBiagio also said Luna had expressed no concerns about his job security at an employee review meeting in June and had no reason to: None of Luna's supervisors "ever indicated we should take any ... action against him."

Luna, a married father of two who joined the federal prosecutor's office four years ago, was stylish and energetic and showed promise as a young lawyer.

The Bronx, N.Y., native and graduate of the University of North Carolina law school had previously worked as an assistant district attorney in Brooklyn, N.Y., and served as a staff attorney at the Federal Trade Commission. He was an associate at the Washington law firm of Arnold and Porter in 1993 and 1994.

Luna's parents, Paul D. and Rosezella Luna, have said they believe his death was related to his work prosecuting violent criminals and have steadfastly rejected suggestions that he had affairs or money problems.

As an assistant U.S. attorney, Luna handled a range of cases, but among his more notable was the prosecution this year of a Navy physicist who was accused of trying to seduce a teen-age girl on the Internet, but who claimed he was only engaged in online fantasy.

Late last year, Luna won convictions in a string of violent Baltimore County bank robberies in a curious trial that produced its own mystery: At the end of the trial, authorities discovered that more than $36,000 in cash disappeared somewhere between the courtroom and the government storage area used to hold sensitive evidence during trials. That loss was never solved.

In recent months, lawyers who had worked with Luna said that he appeared to be distracted and disorganized. Three legal sources, who spoke on the condition of anonymity, said Luna had indicated that he was exploring career options outside of the prosecutor's office.

When he disappeared last week, Luna was concluding a drug conspiracy trial in U.S. District Court against two Baltimore men who were accused of running a violent heroin ring from the Hampden recording studio of their upstart rap music label, Stash House Records.

Late Wednesday, Luna had told a defense attorney in the case that he was returning from home to the

federal courthouse to complete paperwork for expected plea deals in the case the next morning. He left the courthouse about 11:30 p.m., according to building records, and his body was found about six hours later in rural Brecknock Township, Pa.

Investigators have built a detailed timeline of Luna's travels during those hours, according to law enforcement sources. Luna is believed to have set out on the trip willingly and headed toward Philadelphia - not Lancaster County - using an EZ Pass card to slip through toll booths in Delaware and Pennsylvania and making at least two stops: one to withdraw money at an ATM and another where he used a credit card to buy gasoline in King of Prussia, Pa., a busy retail center west of Philadelphia.

Authorities were looking for signs of any other activity on Luna's credit or bank cards.

Over the weekend, federal agents asked Luna's family about other trips he might have taken in recent months to the area where his body was found.

They also were examining messages posted by someone using the name Jonathan Luna on Internet dating sites. The author of the messages, from April 1997, described himself as a discreet, 31-year-old married black man seeking a white female sexual partner and indicated a preference for blondes and redheads.

A law enforcement official said yesterday that investigators were closely examining relationships that Luna had with at least two women. The official did not elaborate on the nature of the relationships.

In Lancaster County, FBI agents have questioned hotel operators near the crime scene about any unusual activity the night of Luna's disappearance.

The agents have asked specficially about unusual activity in hotel parking lots and asked to review guest registers and any outdoor surveillance cameras.

Agents made similar stops at gas stations near the crime scene and along the route that authorities think Luna traveled, according to business operators and law enforcement sources.

Sun staff writers Gus G. Sementes and Lynn Anderson contributed to this article.

*Copyright © 2004, The Baltimore Sun*

# are charged

(H)



ASSAF : SUN STAFF PHOTOS
ndow covering on the
district.

---

**They are accused
of beating 17-year-old
at Cheltenham facility**

---

**Suspects were all fired**

---

**Allegations come at time
when system is struggling
with inadequate staffing**

---

By JEFF BARKER
SUN STAFF

Four staff members at the
state's Cheltenham juvenile de-
tention center have been
charged with assaulting a
17-year-old youth who says he
was held down and repeatedly
kicked and punched in the chest
and face, police said yesterday.

The incident occurred in the
troubled 132-year-old facility in
Prince George's County on Nov.
30, but was not made public un-
til now.

The beating occurred when
the boy refused to go to his
room after dinner, according to
charging documents filed by
state police. Five youths told au-
thorities they saw two workers
hold the youth by his arms and
feet, while two others assaulted
him. The victim — who suffered
bruises, cuts and a swollen jaw
— was naked from the waist
down, several of the witnesses
said.

The workers were placed on
administrative leave and later
fired, according to the state De-
partment of Juvenile Services.
Charges were filed Jan. 28. Two
of the charged former workers
are free on bond, and two were
released on their own recogni-
zance.

The allegations come as the
state has been struggling to ade-
quately staff its eight juvenile
detention centers, where
staffing levels often fall short of
federal targets and workers are
less qualified than required by
some states. Juveniles charged
with offenses such as drug deal-
ing and robbery are sent to the
centers to await court dates or
placement in treatment pro-
grams.

The workers, called youth su-
pervisors, are paid significantly
less than their counterparts in
surrounding states. Maryland's
starting salary for the workers,
is $23,722. 

Other juvenile centers have
also had problems with youth
workers. At the Charles H.
Hickey Jr. School in Baltimore
County, an "overworked staff
and a poor quality of staff" con-
tributes to a "steady stream of
assault/use of force incidents,"
according to the independent
state monitor's office.

News of the charges at Chel-
tenham highlights the need for
juvenile jus- [See Juvenile, 4B]

---

# Search uncovers Luna's penknife

**Federal prosecutor, 38,
was likely stabbed with
it, investigators believe**

---

By GAIL GIBSON
SUN STAFF

Authorities probing the mys-
terious death of Baltimore fed-
eral prosecutor Jonathan P.
Luna now think the young law-
yer likely suffered from stab
wounds inflicted with his own
pocketknife and are re-examin-
ing financial records that may
shed more light on the final
months of Luna's life.

In a recent recanvassing of
the rural Pennsylvania field
where Luna's body was found,
investigators found a penknife
that they believe caused his
wounds, according to two fed-
eral law enforcement sources.
They also said that investigators
believe the pocketknife is the
one that Luna regularly carried.

Luna was stabbed 36 times
and found Dec. 4 facedown in a
shallow creek in rural Lancaster
County, Pa., where authorities
said he drowned. His Honda Ac-
cord was nearby, its engine run-
ning.

It was not known yesterday
whether authorities found fin-
gerprints or blood on the knife,
or why the weapon was not dis-
covered during an extensive
search of the scene on the day
Luna was found.

The discovery of the knife
comes as investigators also have
sought help analyzing medical
and psychological evidence from
a well-regarded military foren-
sics unit as they struggle with a
new, competing theory about
one of the most basic questions
in the case: whether Luna was
the victim of a homicide or sui-
cide.

In FBI reports over the past
month, authorities have raised
the possibility that Luna, 38,
could have killed himself, ac-
cording to three law enforce-
ment sources who spoke with
The Sun on condition of ano-
nymity. The controversial theory
has met sharp [See Luna, 5B]

---

lies

o art



pattern. He used a
o make the design.

h things that are gray,"
ld.

am Downs, 30, working
ide Clark this week,
e urban outdoors was
rfect gallery for his
of a roller coaster
[See Arts, 2E]

---

# niversary

# out party

---

APRIL, 2004

"BALTIMORE SUN"
NEWSPAPER

*[Luna, from Page 1a]*

skepticism internally, however, by a number of investigators who maintain that the evidence points to homicide.

Officials with the FBI's Baltimore field office, which has headed the investigation, have declined to comment on any of the theories that authorities are pursuing to solve the mystery of Luna's death.

"All I can say is the investigation continues," said Special Agent Barry Maddox, a spokesman for the office.

Luna's boss, Maryland U.S. Attorney Thomas M. DiBiagio, has not commented on the investigation since the night that it began, when he said preliminary evidence suggested Luna had been murdered. Vickie E. LeDuc, a spokeswoman for the prosecutor's office, also declined to comment, as has Luna's family.

The energetic and well-liked young prosecutor, who was married and had two young sons, was due in federal court in downtown Baltimore to conclude a drug case on the day that he was found dead. But investigators found no evidence that his death was related to his work, and instead have closely combed Luna's personal life for clues.

**Loan application**

In recent days, investigators have again turned their attention to the unsolved disappearance of about $36,000 introduced as evidence in a bank robbery trial that Luna prosecuted in September 2002. Authorities have not linked the missing cash to Luna or to his death, but investigators now are examining a loan application that Luna filled out online about the time of the trial.

The loan application was for about $30,000, and it was canceled not long after the period when the evidence money was discovered missing, according to a federal law enforcement source. Authorities have determined that at the time of his death, Luna had credit card debts of about $25,000 — and that he had as many as 16 credit card accounts, some that he held without his wife's knowledge.

In addition to financial troubles, Luna also had felt that he was on the outs with his supervisors in the U.S. attorney's office, where he had worked for four years. Several legal sources have said that Luna was concerned he might have to change jobs. DiBiagio has rejected any suggestion that Luna was at risk of being fired.

The highly sensitive question of whether Luna could have killed himself is at the center of a debate among investigators about the direction of the case, as it stretches into a third month with no arrests. To better develop the theory, investigators have asked the Armed Forces Institute of Pathology to examine medical and psychological evidence in the case.

A spokesman for the institute referred all questions about the case.

Already, the case has been marked by competing jurisdictional issues between authorities in Pennsylvania and Maryland. In addition, officials in Washington are investigating whether some supervisors in the FBI's Baltimore office overreached in questioning a female agent in connection with the Luna case, a law enforcement source has told *The Sun*.

**Internal probe**

The Justice Department's Office of Professional Responsibility has opened an investigation into whether supervisors improperly questioned an agent who had worked on several cases with Luna about her personal life and told her to turn over her computer for inspection, the source said.

The internal investigation was first reported Wednesday evening by CBS News.

A federal law enforcement official said yesterday that there has been no finding in the internal probe and emphasized that investigators never considered the agent a suspect in Luna's death — "nor have they developed any suspect," the source said.

In Luna's case, sources have described evidence that appears to run counter to a suicide theory. Officials have said that some of Luna's wounds appear to be defensive and have said that authorities found evidence of a second blood type in Luna's Honda Accord, possibly from an attacker.

Investigators also found blood on the Pennsylvania Turnpike toll ticket that they believed was turned in in rural Ephrata, Pa., when Luna's car exited the highway on the night he was killed. The ticket suggested to investigators the possibility that someone other than Luna was driving the car when it entered and left the Pennsylvania Turnpike because Luna's car had an EZ Pass card, something a driver unfamiliar with the vehicle might not have known.

In the two months since Luna's death, agents also have pored over Luna's financial records, computer files, phone logs and personal contacts in his Palm Pilot, but none of the information has led authorities to a promising suspect.

A state senator from more County has accused Wayne T. Gilchrest's re-election campaign of using his name to open a phony e-mail account to spread allegations of sexual harassment against Gilchrest's opponent in the March 2 Republican primary.

Sen. Andrew P. Harris, the Republican whip, said he sent letters this week to the FBI and the House of Representatives ethics committee, calling for an investigation into an e-mail that bears Harris' name but contains information suggesting that it was composed on a computer in a congressional-district office.

The e-mail accuses Gilchrest's challenger, state Sen. Richard F. Colburn, an Eastern Shore Republican, of having "a long history of sexual harassment of interns in the Maryland General Assembly" — allegations that Colburn has denied.

The e-mail was received last week at Colburn's campaign headquarters, where it was opened by his wife, Alma, the senator said yesterday.

Colburn denied the harassment allegations. He said he believes voters in the 1st District, which includes the Eastern Shore and parts of Anne Arundel, Baltimore and Harford counties, will be turned off by the tactics he accuses the Gilchrest campaign of employing.

"The proper authorities will be involved," he said. "Other than that, we are not addressing or going to enhance his attempt to do a character assassination.

eighth term, called the allegations "absurd, patently absurd."

"I don't have time for petty, immature, elementary school games and tactics," Gilchrest told *The Washington Post*. "We're so far ahead, in a hard-



LET YOURSELF PLAY

**SUPER DRAW WIN**

Match the first 1

Watch the grand prize drawing for the
This is a bonus game. See your Lottery Retailer
The Maryland Lo

## Public won't be told about evacuation plan

ASSOCIATED PRESS

A secret plan designating Frederick as an evacuation site if terrorists attack Washington or Baltimore will be shared with municipal leaders but not with the public, Frederick County Sheriff James Hagy says.

Hagy, who heads a county terrorism response committee, announced he would meet Thursday to discuss the plans with leaders after some complained they were left out of the loop.

Details of the 54-page plan, code-named the Genesis Project, were reported Sunday by *The Frederick News-Post* and *The Washington Post*. The Frederick Fairgrounds would be converted into a medical treatment and decontamination center, the reports said.



OPENING THE NEW
HIPPODROME THEATRE!

THE MOST TONY AWARDS IN BROADWAY HISTORY

THE PRODUCERS
THE NEW MEL BROOKS MUSICAL

BOB AMARAL    ANDY TAYLOR



ONE

THI

## Ehrlich plan doesn't raise gasoline or titling taxes

*By Michael Dresser*
SUN STAFF

Gov. Robert L. Ehrlich Jr. will announce a long-awaited $250 million transportation revenue package today that will not raise gasoline or titling taxes but will rely heavily on increased registration fees.

The package will fall short of the $300 million a year called for by a task force led by former Transportation Secretary William K. Hellmann — a goal Ehrlich had endorsed. The money will shore up the state's Transportation Trust Fund, which has been depleted by rising costs and diversions of money to bal-ance the state budget.

Paul E. Schurick, a top aide to Ehrlich, said raising the full $300 million proved unnecessary because the state has recently seen an unexpected increase in transportation revenues of more than $50 million.

"The governor believes this is a balanced and responsible revenue package," Schurick said.

He said the largest component of the revenue package will be an increase in registration fees, which are expected to bring in $150 million in additional money each year. He said the average increase would be about $23.50 a year, with smaller cars paying less than larger vehicles.

Higher fines on drunken drivers will also be a component of the plan. He will call for shifting some money now collected in car rental taxes from general use to transportation.

The governor had ruled out an increase in the 23.5-cent-a-gallon gasoline tax weeks ago, after Republican legislators expressed opposition. The titling tax remained on the table until recently, but it faced vehement opposition from auto dealers — a strong constituency for Ehrlich.

Schurick acknowledged that the administration consulted widely with legislators of both parties, but not with the Democratic leadership.

The package could face opposition from General Assembly Democrats, many of whom consider a gas tax the fairest way to raise transportation revenue. Gas tax proponents say it is the only revenue-raiser that brings in money from out-of-state driv-ers as well as Maryland residents.

Del. Peter Franchot, chairman of a House subcommittee on transportation spending, said business groups will be dismayed that Ehrlich stopped short of raising the full $300 million.

"It's ducking his responsibilities, and it's a huge disappointment to everyone who's concerned with the transportation infrastructure," the Montgomery County Democrat said.

Franchot said he doubts that much of the package will be approved — especially if the governor refuses to negotiate with Democratic leaders on education funding.

*The Associated Press contributed to this article.*

---

# Disabilities activist says state agency tracked him

*[Dispute, from Page 1B]*

bility program. The program contracts with Yellow to provide van and taxicab service to the disabled.

"We were trying to find out

## E-mail angers disability rights advocate

This e-mail exchange about activist Joel D. Myerberg, whose name is misspelled throughout, is being defended by the Department of Transportation as an appropriate inquiry into whether he has received preferential treatment.

From:    Ruth Silverstone
To:      Rachael Gingrich
Date:    11/12/2003 3:22:04 PM
Subject: Re: Joel Meyerberg and Yellow

Please call me at ▇▇▇▇▇▇▇
I can answer your questions.
Ruth

>>> Rachael Gingrich 11/12/03 03:19PM >>>
Maggie,

Per our conversation this morning, this is to find out whether he is an MTA or regular Yellow customer.

Here are the details of our meeting on November 8 at 3:00.

- He lives in Baltimore and received transportation to Annapolis (State House). He said he frequently does this because he testifies during session.

- Yellow driver waited for him (on 2nd floor of the State House) during meeting.
    ....................... 4:00, however, Mr. Meyerberg did not leave until almost 4:30 (was











HURRY! OFFER

0.9% FOR

$15

UNO

No purchase necessary. Just drop off a 3x5 card to the Baltimore Sun lobby titled "Producers Promotion" with your name address and phone number to be entered to win. Winners will be randomly chosen. Limo service is provided to and from the show.

$17.50 per month per $1,000 borrowed. ...

WIN
2 tickets to the March 9th performance of
THE PRODUCERS
the new MEL BROOKS musical
at the Hippodrome Theatre.

...dinner for two, limo service*, and

Buy The Sun February 2 - 29 and use your [GIANT logo] to be automatically entered to

THE SUN
FRANCE-MERRICK
GIANT

If authorities conclude that Luna's death was a suicide, the finding could open investigators to allegations that they simply failed to solve the high-profile

coroner's office said it could not determine whether stab wounds to Smith's chest were most likely inflicted by him or by someone else.

More recently, the stabbing death in December of Oscar-nominated singer-songwriter Elliott Smith — initially thought to be a suicide — remains an open question after the Los Angeles

Army officials ruled that a National Guard captain found dead at a Kentucky base with 26 stab wounds to the neck and chest was a suicide, a finding that was disputed by the soldier's family.

While rare, there are some high-profile instances of suicides by stabbing, cases frequently marked by so-called "hesitation wounds" that rarely penetrate the skin. In 1999,

his chest and neck in addition to several deeper, more serious stab wounds.

Archives: New York Post

Page 1 of 1



# SLAIN FED'S SECRET LIFE

*NILES LATHEM Post Correspondent*. **New York Post**. New York, N.Y.: Dec 8, 2003. pg. 019

**Full Text** (361   words)

*Copyright 2003, The New York Post. All Rights Reserved)*

COLUMBIA, Md. - Investigators probing slain federal prosecutor Jonathan Luna's grisly death are zeroing in on the details of his personal life - including possible sex solicitations via the 'Net, mystery trips to Pennsylvania and a credit card his wife didn't know about.

Law-enforcement officials familiar with the probe into the slaying of the Bronx-born assistant U.S. attorney said yesterday they are focusing increasingly on the theory that his murder was the result of a personal relationship gone awry, rather than a random robbery or something connected to his work as a drug prosecutor in Maryland.

FBI agents and Pennsylvania state police are interviewing friends and relatives, as well as canvassing hotels around Lancaster County, Pa., near where Luna's body was found Thursday.

Luna died after being stabbed 36 times, apparently tortured with a pen knife, authorities said.

Investigators discovered that in recent weeks, Luna had made at least two other unexplained trips to the area that do not appear to have been work-related.

His father, Paul Luna, said that his son just last week canceled a trip they had planned to make to New York this past weekend. The elder Luna said his son told him he couldn't make the trip because he had business in Pennsylvania.

In the aftermath of his death, Luna, 38, has been portrayed by friends and colleagues as a hard-working lawyer and devoted family man who rose from the projects of the South Bronx to a promising career in law enforcement.

But investigators say that friends privately told them after his death that he seemed distracted and stressed out at work in recent months.

Law-enforcement sources said they also have discovered he had a credit card that his wife didn't know about.

The FBI is also examining postings on adult Web sites in which a man by Luna's name is seeking female sex partners.

Although law-enforcement officials say they aren't sure Luna actually posted them, The Post examined one made in 1997 in which the man looking for sex describes himself as a then-31-year-old lawyer living in Brooklyn.

Luna was living in Brooklyn and 31 years old at the time.

ʃ

*December 14, 2003* -- WASHINGTON - For every sign that Bronx-born federal prosecutor Jonathan Luna was leading the picture-perfect life, there were hints that his world was spiraling down in despair.

There was the beautiful family, and his Tiger Woods smile. But there was also the mounting debt and his "party guy" reputation.

Investigators believe Luna may have led two lives. They also believe one of them may have gotten him killed.

The body of Luna, who worked in Baltimore, was found Dec. 4 in a Pennsylvania creek with his bloodstained car idling nearby.

The body was released to his family Friday who will bury him in a private service near his Columbia, Md., home tomorrow.

The grisly nature of Luna's death - 36 wounds with a penknife and a savage beating to his groin - and his sudden decision to drop urgent work to travel north, indicate to the feds that there was something he kept secret in his personal life.

The discovery of a credit card with a $25,000 balance that his wife didn't know about, along with pornography on his Justice Department computer and ads that someone with his name posted on adult dating Web sites only deepened their suspicions.

So, too, did e-mails found in home and work computers written in the weeks before Luna died.

The 38-year-old father of two and former assistant U.S. attorney in Brooklyn confided to friends, in a series of anguished communications, that he was having problems in his marriage with obstetrician wife Angela, law-enforcement sources said.

Luna also wrote to friends that he had problems at work and that he was drowning in debt, officials close to the probe said.

"The whole thing is baffling to me," said Baltimore lawyer Kenneth Ravenell, a friend of Luna. "What was he doing willfully heading away from Baltimore when he had to be back in court in a couple of hours?"

The increasingly lurid twists to the Luna murder case have painted a picture of a man his own family did not know.

They knew a man who grew up poor in the South Bronx's Mott Haven projects, who put himself through Fordham University and the University of North Carolina law school, where he met his wife.

They knew a devoted family man, a father of two boys - one 5, one 10 months - who was a die-hard Yankee fan and avid golfer. He once took a year off from law school to help care for his father, Paul, 83, who was suffering from complications of an ulcer.

His father said Luna and his wife had a "perfect marriage," and the father and son were planning a trip to Paul's native Philippines next month.

A photograph of Luna and then-candidate George W. Bush hangs proudly on the refrigerator at Paul Luna's home.

"You know that picture you see of him on TV with the big smile? That's how he was all the time, happy and smiling all the time," said Dana Stango, a neighbor and family friend.

Stango said Luna and his wife recently decided to forgo a move to a bigger house so that they could spend extra money on family vacations.

But it appears that Luna was living at least two lives well before he moved to the Baltimore area four years ago.

A spokesman for the Brooklyn DA's office called him a "dedicated and capable attorney," while other legal sources in Brooklyn remember Luna as a "party guy" who kept late hours at bars on Court Street.

These sources said he associated with a group of rogue assistant district attorneys who later were investigated in a scandal that involved throwing cases in return for bribes. One assistant DA was fired and the rest were cleared as a result of the probe.

Luna was not involved in the case, and cops say there is no evidence these links were in any way involved in his murder.

The first possible signs of trouble in Luna's federal career in Baltimore emerged last year when $36,000 disappeared in a bank robbery trial he was working on. There is no evidence Luna was ever involved or was ever under suspicion, investigators say. But months afterward, he was confiding to friends that he believed he was on the outs with new Baltimore U.S. Attorney Thomas DiBiagio.

Recently, during a case involving two aspiring rappers accused of running a violent drug ring, Luna appeared distracted and stressed out.

Luna was later forced to enter into a plea agreement favorable to the defendants when it was revealed that his star witness had escaped monitoring while under house arrest and was caught with cocaine.

Luna had failed to mention that in pretrial sessions. The judge gave the defense extra time to prepare for cross-examination. But Luna chose to enter a plea.

Luna was supposedly working on the paperwork the night he died and was due in court at 9:30 the next morning.

The lawyer for one of the defendants said he talked to Luna at about 10:30 p.m. Dec. 3 and was told he could expect the documents to be faxed to him shortly.

The fax never came.

Luna left the office at 11:30 p.m. and headed for Philadelphia, according to electronic tollbooth records. Workers at a Sunoco station in King of Prussia, Pa., said Luna bought gas there after 3 a.m. Dec. 4. His body was discovered at 5:30 a.m. off the Pennsylvania Turnpike in Denver, Pa., about 45 miles west of King of Prussia.

SCHULMAN, TREEM, KAMINKOW,
GILDEN & RAVENELL, P. A.

ATTORNEYS AT LAW

SUITE 1100, THE WORLD TRADE CENTER
401 EAST PRATT STREET
BALTIMORE, MARYLAND 21202

KENNETH W. RAVENELL

(410) 332-0850
(410) 659-0111
FAX (410) 332-0866

March 8, 2004

ATTORNEY/CLIENT CORRESPONDENCE
Nacoe Brown
Reg. # 34730-037
Lee U S P
P. O. Box   305
Jonesville, VA 24263

Dear Nacoe:

    I have read your letter and find no basis for it.  If you wish to file such a Motion with the Court of Appeals, you are free to file it.

Very truly yours,

Kenneth W. Ravenell

Kenneth W. Ravenell

KWR/djn

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MARYLAND


United States of America,

     v.

Nacoe Ray Brown,

     Defendant.

Criminal No: 01-0377


NOTICE OF MOTION SEEKING NEW TRIAL PURSUANT TO

CRIMINAL RULES OF PROCEDURES RULE <u>33</u>

_____


    Now Comes, Nacoe Ray Brown, (Pro-Se) on this _____ day of April, 2004., will respectfully move before this honorable court seeking a New Trial in light of Newly Discovery Evidence. Pursuant to Rule 33 of the Criminal Rules of Procedures.


April _____, 2004                              Signed:_____


CERTIFICATE OF SERVICES

    It is on this ____ day of April, 2004., that I, Nacoe Ray Brown (Pro-Se) has placed in the United States mail Box one original and two copies of this Notice addressed to the Clerk of this Court., and has also forwarded one copy to the attention of the Office of the United States Attorney.


April ___, 2004                               Signed:_____

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MARYLAND


United States District Court,

       v.

Nacoe Ray Brown,

     Defendant.                    Criminal No: 01-0377


AFFIDAVIT IN SUPPORT OF DISCOVERY MOTIONS

I, Nacoe Ray Brown, (Defendant) hereby states that the below listed facts are true to the best of my knowledge and submits this affidavit in accordance with the law of perjury.


1)  I, <u>Nacoe Ray Brown</u> (Defendant) am the defendant in the above mentioned matter;

2)  I, <u>Nacoe Ray Brown</u> (Defendant) sat before the honorable Andre M. Davis; and a trial by jury was held;

3)  I, Nacoe Ray Brown (Defendant) states that the prosecuting attorney was one Johnathan P. Luna;

4)  I, <u>Nacoe Ray Brown</u>, (Defendant) was represented by a Mr. Kenneth W. Ravenell;

5)  I, Nacoe Ray Brown, (Defendant) states that subsequent to my actual sentencing before Honorable, Andre M. Davis (U.D.C.J) that it had

②

-10)  governments file pertaining  directly to  my  criminal trial.


I, Nacoe Ray  Brown, (Defendant) states that this affidavit in now

completed by my signature at the  bottom.



April_____, 2004                          Signed:_____

                                          Witness:_____

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MARYLAND

United States of America,

    v.

Nacoe Ray Brown,
       Defendant.            Criminal No:  01-0377


## NOTICE OF MOTION SEEKING TO HAVE THE GOVERNMENT

## TURN OVER ADDITIONAL DISCOVERY INFORMATION


    Now Comes, Nacoe Ray Brown, (defendant) will respectfully move before this honorable court, United States District Court  For the District of Baltimore, Maryland. On this ____ day of April., 2004., Requesting that this court issue an order compelling the Government to turn over additional discovery material relating directly to this defendant's criminal matter.


April ____, 2004                              Signed:_____

United States of America v. Nacoe Ray Brown                    Page 1 of 6
Appeal No: 03-4060



## AFFIDAVIT IN SUPPORT OF MOTION TO STAY APPEAL UNTIL
## THE DISTRICT COURT HAS HAD TIME TO REVIEW THE ADDITIONAL
## WHICH SHOULD HAVE BEEN MADE APART OF THE ORIGINAL RECORD


I, Nacoe Ray Brown, (Appellant hereafter) hereby dispose and states that the below listed facts are true to the best of my knowledge and submits this affidavit in support of my motion seeking to have my direct appeal stayed in the United States Court of Appeals for the Fourth Circuit pending the outcome of the current investigation pertaining to my criminal matter in the district court.

I submit this affidavit in accordance with the laws of perjury.

1)    I, Nacoe Ray Brown, (Appellant hereafter) was originally indicted on July 10th, 2001., charging this appellant with violation(s) of 18 U.S.C. §2113(a) & (d);

2)    On or about August 29th, 2001., a superseeding indictment was filed in the United States District Court for the District of Maryland charging this appellant with additional count(s) of violation(s) of 18 U.S.C. §2113 (a) & (d);

**United States of America v. Nacoe Ray Brown**                    Page 2 of 6
**Appeal No: 03-4060**

3)    On or about <u>October 19th, 2001,</u> the government filed a notice seeking
to introduce 404(b) evidence;

4)    On or about <u>September 9th, 2002.</u>, a nine day trial was held before the
Honorable: Andre M. Davis, and on <u>Septmeber 26, 2002.</u>, the jury found app-
ellant guilty of three (3) counts of the four count indictment. [Judge
Davis declared a mistrial as to count one]

5)    Appellant was represented by counsel of the record on appeal. [ Kenneth
Ravenell);

6)    The government was represented by a <u>Mr. Johnathan P. Luna,</u> (A.U.S.A.);

7)    During this criminal proceedings the jury had sent in a note requesting
to review evidence ($36.000.00 dollars) in this criminal trial., but, was
denied as the result of the Prosecuting Attorney allegedly stealing of this
monies: (see, News Paper Article : Dated: <u>February 13, 2004</u>)[annexed hereto]

8)    It is this appellant's belief that upon the discovery of this evidence
($36.000.00 dollars) missing from my criminal proceedings that an investigation
was being conducted of several parties participating in my prosecution ;

9)    It is this appellant's belief that there is a current investigation going
on pertaining to the death of this Prosecuting Attorney, and the missing funds
from my criminal trial, and that based upon the facts of a current investigation

United States Of America v. Nacoe Ray Brown                    Page 3 of 6

Appeal No: 03-4060


-9)    into the missing $36.000.00 dollars (evidence) in my criminal trial

this appellant has reason(s) to believe that not only was the money

taken by the prosecuting attorney., But, also, that this investigation

will reveal that this prosecuting attorney withheld evidence that would

have freed this appellant from his wrongful conviction;


10)    Appellant believes that the Office of The United States Attorney has an

obligation to hand over this investigative reports to the defendant pursuant

to Federal Rules of Criminal Procedures: Rule 16(c) as the missing evidence

relates directly to my trial;


11)    The current investigation relates directly to the prosecution of my

criminal trial as the result of the missing $36.000.00 dollars alleged to

have been taken by the Prosecuting Attorney: Johnathan P. Luna ;


12)    This appellant seeks to be heard in the district court on a motion re-

questing that this discovery be handed over to the defendant in this crimi-

nal matter in order for this defendant to properly litigate an appeal which

would consist of all relevant facts regarding the  Prosecution Mis-Conduct

by the Office of the United States Attorney which denied this appellant of

a fair trial;

United States of America v. Nacoe Ray Brown                    Page 4 of 6
Appeal No: 03-4060

13)    Appellant request that this appeal be held in abeyance and that this
       criminal matter be remanded back to the district court to conduct the
       further hearings necessary to find resolution of the remaining intere-
       lated issues, and to enter a final Order disposing of the issue(s);

14)    Appellant believes that such course would be appropriate because as
       addressed in this affidavit, it would eliminate the very real prospect
       of piecemeal appellate litigation, thereby conserving the resources of
       this court and preventing additional incursions upon appellant's 5th and
       6th amendment rights by permitting all relevant and related issues to be
       addressed in a single appeal, on a full record, while at the same time
       fully preserving this appellant's right of appeal pursuant to _____.

15)    Appellant aniticipates to file within the United States District
       court motion(s) regarding compelling the government to hand over
       the mentioned investigative report(s) from the current investigation
       that is presently being conducted by the Department of Justice ;

16)    Appellant aniticipates to file within the United States District
       Court Motion(s) compelling the government to hand over the mentioned

**United States of America v. Nacoe Ray Brown**
**Appeal No: 03-4060**

-16)   investigative reports within the possession of the Office of

The United States Attorney regarding the unprofessional handling

of the evidence in this appellant's criminal proceeding(s);

-17)     Appellant aniticipates on filing within the United States

District Court Motion(s) requesting to be heard on the matter of

prosecution misconduct;


In conclusion, Appellant seeks to have this matter remanded back to

the United States District Court for consideration of the additional facts

that has been omitted from the original record.


It is on this _29_ day of February _29_ , 2004., that I, Nacoe Ray Brown,

has prepared this affidavit and had it witnessed by the below listed individual.

Signed: _N B_                           Dated: _2-29-04_


It is on this _29_ day of February. 2004., that I, _NACOE BROWN_

states that , Nacoe Ray Brown, has signed this document before me.

Signed: _N B_                           Dated: _2-29-04_

*5*

United States of America,

     v.

Nacoe Ray Brown,

    Appellate.              Criminal No:_____

                                   Appeal No: 03-4060

## AFFIDAVIT OF PROSECUTORIAL MISCONDUCT

I, Nacoe Ray Brown, (Defendant/Appellate) state that the below listed facts are true to the best of my knowledge and submits this affidavit in accordance with the laws of perjury.

1)  I, Nacoe Ray Brown (Defendant/Appellate) am the above mentioned appellate in the above caption matter;

2)  I, Nacoe Ray Brown (Defendant/Appellate) state that that through-out the above criminal procedings I have been represented by a Mr. Kenneth Ravenell (Schulman Treem, Kaninkow Gilden & Ravenell, 401 East Pratt Street, 1800 World Trade Center, Baltimore, Maryland 21202);

3)  I Nacoe Ray Brown, (Defendant/Appellate) states that the prosecuting attorney for the Government was a Mr. Jonathan P. Luna, Office of the United States Attorney for the District of Maryland);

4)   I, Nacoe Ray Brown, (Defendant/Appellate) states that during my trial it had been discovered that approximately $ 36,000.0 (Thirty Six Thousand Dollars) [Government's exhibit_____] had been stolen by the Prosecuting Attorney Johnathan P. Luna;

5)   I, Nacoe Ray Brown (Defendant/Appellate) states that the above mentioned in paragraph #4 event took place prior to my actual sentencing, but, during the trial process ;

6)   I, Nacoe Ray Brown, (Defendant/Appellate) states that counsel of the record (Kenneth Ravenell) was fully aware of the prosecuting Attorney "Jonathan P. Luna" prosecution mis-conduct and failed to bring any of these facts to the district courts attention on the record;

7)   I, Nacoe Ray Brown, (Defendant/Appellate) states that upon taking a microscopic review of this appellate's brief prepared by counsel of the record, that counsel of the record still makes no reference to this pro- secuting Attorney's Mis-conduct during my criminal trial;

8)   I, Nacoe Ray Brown, (Defendant/ Appellate) states that I have reasons to believe that counsel of the record may have participated in the theft of the missing monies from my criminal procedings;

9)   I, Nacoe Ray Brown, (Defendant/Appellate) states that there is presently an ongoing investigation into the death of the prosecuting Attorney, and the missing thirty six thousand dollars;

5

10)    I, Nacoe Ray Brown, (Defendant/Appellate) states that as the result of the missing thirty six thousand dollars from evidence in my criminal procedings, which took place during my trial, I have reasons to believe that additional evidence has been tamper with in my case;

5

11)    I, Nacoe Ray Brown, (Defendant/Appellate) states that an investigation of the prosecuting attorney was being conducted while my criminal trial was being conducted in the district court;

12)    I, Nacoe Ray Brown, (Defendant/Appellate) states that I have reasons to believe that counsel of the record may have had something to do with this missing thirty six thousand dollars (evidence in my trial);

13)    I, Nacoe Ray Brown, (Defendant/Appellate) states that I have requested this counsel of the record to request the investigation reports from the government as the government had an obligation to hand over any and all additional evidence resulting from their investigation of my case;

14)    I, Nacoe Ray Brown, (Defendant/Appellate) states that I am requesting that an new attorney be assigned to this appellate, and that my direct appeal be held in "abeyance" pending the final outcome of the investigation regarding evidence missing from my criminal trial;

15)    I, Nacoe Ray Brown, (Defendant/Appellate) states based upon my personal belief that counsel of the record along with the prosecuting attorney on my case may have stolen this evidence together.

## Certificate of Services

It is on this ____ day of March, 2004., That I, Nacoe Ray Brown

(Defendant/ Appellate) has placed in the United States Mail Box one

original and four copies of this motion seeking the assignment of

counsel, addressed to the Clerk of this Court and has also forwarded

copies to the below listed parties:

5

Mr. Kenneth Ravenell                    Harry M. Gruber, (A.U.S.A)
Schulman Treen, Kaminkow                 Office of the United States
Gilden & Ravenell                        Attorney
401 East Pratt Street                    6625 United States Courthouse
Baltimore, Maryland                      101 West Lombard Street
   21202                                 Baltimore, Maryland
                                            21201


Honorable, Andre M. Davis
United States District Court
District of Maryland
101 Lombard Street
Baltimore, Maryland
   21201

IN THE   UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT


United States Of America,

    .v.

Nacoe Ray Brown,

      Appellate.                Appeal No: 03-4060

6

**NOTICE OF MOTION SEEKING PERMISSION TO FILE MOTION SEEKING THE**

**APPOINTMENT OF NEW COUNSEL**

It is on this 23rd, day of 2004., that I, nacoe Ray  Brown, (Appellate) respectfully moves before this honorable court seeking permission  to file this motion seeking the appointment of new appeal counsel.

Appellate, will rely upon the annexed hereto affidavit  and motion to support his desire to have new counsel appointed.


March 23rd, 2004                Signed:_____


CERTIFICATE  OF SERVICES

It is on this 23rd day of March,  2004., that I, Nacoe Ray  Brown, (Appellate) has placed in the U.S. Mail Box One original and four copies of this  document addressed to the clerk of this court  and has forwarded copies to all relevant parties.

March 23rd, 2004                Signed:_____

IN THE UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT


United States  of America,

    vs.

Nacoe Ray Brown,                    Appeal No: 03-4060

    Appellate.                      Criminal No: _CF-377-RMW_

## NOTICE OF MOTION SEEKING ASSIGNMENT OF NEW COUNSEL


It  is on this day _23_ of March., 2004. That  I, Nacoe Ray Brown

(Appellate)  Pro-Se,  will respectfully move before this honorable court

seeking  the assignment of new counsel as the result of a conflict  of

interest.

This Pro-Se Appellate  will rely upon the annexed hereto affidavit

in  support of this motion seeking appointment of new counsel pursuant

to 18  U.S.C §3006(A)


March _23_, 2004                    Signed: _____

Nor did the evidence have much nexus to the Defendant's rationale for this evidence on appeal--that he had access to other funds that purportedly eliminated the motive to rob a bank. Defendant's Br. at 28. His possible access to a limited amount of money from Mr. Kelly's purported loan bore little relevance to the question of whether Brown was motivated to commit the bank robberies.

This Court has upheld trial court decisions excluding marginal evidence similar to this many times. See, e.g., U.S. v. Morison, 844 F.2d 1057, 1078 (4th Cir. 1988) (upholding district court's rejection of proffered evidence in criminal case). See also United States v. Rubio-Topete, 999 F.2d 1334, 1339-40 (9th Cir. 1993) (holding that the exclusion of "marginally relevant" evidence does not violate a defendant's due process rights).

The admission of this evidence would have been especially problematic in this case because the Defendant failed to announce his desire to call this witness until the eighth day of trial. At this point, the district court read the name of this witness, along with the other witnesses newly announced by the defense, to the jury. One juror indicated she thought she recognized Mr. Kelly's name. Viewed against this backdrop, the Court properly precluded Defendant from calling a witness who would testify to irrelevant matters. The district court had the discretion and, indeed the duty, to properly manage the trial by excluding Mr.

54