UNPUBLISHED

# UNITED STATES COURT OF APPEALS
### FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
             *Plaintiff-Appellee,*

v.                                            No. 03-4060

NACOE RAY BROWN,
             *Defendant-Appellant.*

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
Andre M. Davis, District Judge.
(CR-01-377-AMD)

Submitted: March 8, 2004

Decided: April 6, 2004

Before MICHAEL, SHEDD, and DUNCAN, Circuit Judges.

Affirmed by unpublished per curiam opinion.

### COUNSEL

Kenneth W. Ravenell, SCHULMAN, TREEM, KAMINKOW, GIL-
DEN & RAVENELL, P.A., Baltimore, Maryland, for Appellant.
Thomas M. DiBiagio, United States Attorney, Harry M. Gruber,
Assistant United States Attorney, Baltimore, Maryland, for Appellee.

Unpublished opinions are not binding precedent in this circuit. See
Local Rule 36(c).

## OPINION

PER CURIAM:

Nacoe Ray Brown appeals his conviction and sentence on three counts of bank robbery, in violation of 18 U.S.C. §§ 2113(a), (d), (f) (2000), 18 U.S.C. § 2 (2000). He was convicted after an eight day jury trial. The district court sentenced him to a term of 300 months' imprisonment. On appeal, he raises several challenges arising out of the trial of this matter. We have reviewed the record, together with Brown's claims on appeal, and find no basis on which to vacate his conviction or sentence.

First, Brown alleges the district court erred in denying his motion to suppress evidence seized from his residence. Contrary to Brown's assertion, we find there was ample probable cause on which the federal magistrate based his issuance of the residential search warrant. This evidence included a ten page, single-spaced warrant application which detailed extensively Brown and Kevin Hilliard's course of illegal conduct during the robberies, which was drafted by a trained and experienced FBI Special Agent with expertise in bank robberies, who attested specifically to the probability that proceeds from the bank robberies, as well as other evidence particularly described in an attached list, would be contained within Brown's residence. The total circumstances support a nexus between Brown's criminal activity and his residence sufficient to support issuance of the warrant. *See Illinois v. Gates*, 462 U.S. 213, 238 (1983).

Brown next contends that the district court erred in admitting into evidence facts relating to his attempt to escape from jail while awaiting trial. He relies on Fed. R. Crim. P. 404(b) to support his argument, claiming specifically that the evidence was unnecessary and that its probative value was clearly substantially outweighed by unfair prejudice. We review the district court's decision on the admission or exclusion of Rule 404(b) evidence for abuse of discretion, *United States v. Simpson*, 910 F.2d 154, 157 (4th Cir. 1990), and the district court's determination relative to the probative and prejudicial value of Rule 403 evidence likewise is entrusted to the sound discretion of the trial judge. *United States v. Morison*, 844 F.2d 1057, 1078 (4th Cir. 1988). We agree with the district court that the attempted escape

evidence was properly admissible as evidence of consciousness of guilt, even absent an express admission by Brown of this fact. *See, e.g., United States v. Peoples*, 748 F.2d 934, 936 (4th Cir. 1984); *United States v. Bartelho*, 129 F.3d 663, 677-78 (1st Cir. 1997).

Brown next challenges the district court's decision to excuse a juror over defense objection, a decision this court reviews for abuse of discretion. *United States v. Nelson*, 102 F.3d 1344, 1349 (4th Cir. 1996). The district court considered the circumstances, as well as the time it would take for the juror to get to the courthouse, and determined that it was not required by the interest of justice to further delay the trial to wait for this juror. Moreover, there is no suggestion here, nor does Brown assert, that the juror was excused because she was African-American. Rather, he merely complains that she happened to be but one of two African-Americans on his jury panel. Because there was a legitimate basis for the district court's decision to replace the juror at issue, we find this claim to be without merit.

Brown next asserts that the district court abused its discretion in permitting Hilliard to read a letter to the jury that Brown wrote on the basis that the letter contained a reference to Brown's lack of plea negotiations with the government. The admission of the plea evidence here was appropriate because Brown's statements were not made pursuant to plea negotiations. *See United States v. Porter*, 821 F.2d 968, 976-77 (4th Cir. 1987).

Brown raises several related allegations of error by the district court relative to the fact that in the middle of trial, Brown's attorney, Kenneth W. Ravenell, learned his firm had previously represented in an unrelated case one of the government's primary witnesses, Kevin Hilliard. Brown's counsel moved to withdraw as Brown's attorney, sought a continuance to obtain alternate counsel to cross-examine Hilliard, and moved for a mistrial relative to this conflict. After being advised by the trial court and his counsel, Hilliard testified that he was willing to give up the confidentiality privilege with defense counsel. Following thorough consideration of defense counsel's motions for mistrial and to withdraw, the district court denied the motions. Following the denial, Mr. Ravenell conducted a vigorous cross-examination that included questioning Hilliard about his prior arrest history, his statements to Brown, his bias, and possible inconsisten-

cies in his story. The detailed cross-examination occupies more than sixty pages of transcript, and Mr. Ravenell used all available information, including information originally learned in a privileged capacity, to dispute and discredit Hilliard's testimony and credibility.

While the discovery of an attorney's prior relationship with a witness in the middle of a trial is unusual, Brown has presented no convincing evidence of an actual conflict or an adverse effect on performance such that he was denied effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668 (1984), *Beaver v. Thompson*, 93 F.3d 1186, 1192 (4th Cir. 1996). We find no error in the district court's denial of the defense motions for mistrial, for a continuance, or to withdraw as counsel.

Brown also contends that the district court erred in failing to declare a mistrial when Hilliard testified that Brown related to him that Brown's attorney told Brown he felt he could "beat the case" if Hilliard did not testify against Brown. We find no extraordinary circumstances here that would support disturbance of the district court's discretionary decision not to grant a mistrial based on the one statement by Brown's attorney. *United States v. Hayden*, 85 F.3d 153, 158 (4th Cir. 1996).

Next, Brown challenges the district court's decision to not allow testimony from a defense witness who allegedly would have provided circumstantial evidence that Brown did not commit the robberies. We find no abuse of the district court's discretion in excluding this evidence, following its consideration of counsel's arguments on the issue. *United States v. Carter*, 300 F.3d 415, 423 (4th Cir. 2002).

Brown's final issue on appeal is that the district court erred in giving a slightly different jury instruction on identification from the instruction requested by the defense. We review for abuse of discretion the district court's decision whether to give a particular jury instruction, and the content of an instruction given. *United States v. Russell*, 971 F.2d 1098, 1107 (4th Cir. 1992). Because Brown's requested identification instruction was substantially similar to the charge given and did not seriously impair his ability to conduct his defense, *United States v. Lewis*, 53 F.3d 29, 32 (4th Cir. 1995), we find no reversible error.

Accordingly, we affirm Brown's conviction and sentence. We dispense with oral argument because the facts and legal contentions are adequately presented in the materials before the court and argument would not aid the decisional process.

*AFFIRMED*

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF BALTIMORE MARYLAND

SEP 0 2 2005

Necoe Ray Brown,

    Petitioner,

                          Criminal No.: <u>01-0377</u>

    Vs.

United States of America

<u>       Respondent.        </u>/

## MOTION PURSUANT TO THE FEDERAL RULES OF  CRIMINAL PROC., RULE 33((b)(1)

    **COMES NOW**, Petitioner, Nacoe Ray Brown (hereinafter referred to as Petitioner of "Brown"), to move this Honorable Court based on "Newly Discovered" evidence, which if determined true, warrant "automatic reversal", as it and its contents raise to the level of structual error.

    In bringing this motion forth, Petitioner request that his timely filed 28 U.S.C. §2255, be held in abeyance until this Rule 33 motion has had a full and fair opportunity to run it's course. That's including any such appellate review if it becomes necessary.

### PRO-SE PLEADINGS

    Petitioner avers that pro-se pleadings are to be construed "liberally" and held to less stringent standard than formal pleadings drafted





(1)

by lawyers; "if a court can reasonably read the pleadings to stating a "valid claim" on which the litigant could prevail, it [the court] should do so despite failure to cite proper legal authority, confusion of legal theories, poor syntax or sentence construction, or the litigants plain unfamiliarity with pleading requirements". <u>Id</u> <u>Haines v. Kerner</u>, 404 U.S. 519(1972); <u>Boag v. MacDougall</u>, 454 U.S. 364(1982).

### RULE  33  (b)(1)

<u>"Newly Discovered Evidence"</u>:

> **[A]ny motion for a new trial grounded on newly discovered evidence must be filed within 3 years after the verdict or finding of guilty. If an appeal is pending the court may not grant a motion for a new trial until the appellate court remands the case.**

Thus, as amended under Rule 33(b)(1), Petitioner's judgement in the instant matter became final at the conclusion of the action within the court of appeals, which is within "3 years". See **<u>United States v. Reyes</u>, 49 F.3rd 66 (2nd Cir. 1995)**, for criminal number **01-0377**.

### STATEMENT OF THE CASE

On or about September 2002, a nine day jury trial ensued in the Northern District of Baltimore, Maryland, before the Honorable Judge Andre M. Davis, U.S.D.J.,. And on September 26, 2002, the jury convicted Petitioner of three (3) of a four (4) Count indictment of offenses stemming from Title 18 U.S.C. §2113(a) and (d) and 18 U.S.C.§2.

Petitioner was represented by Attorney, Mr. Kenneth Ravenell. The United States was represented by Assistant U.S. Attorney, **Johnathan P. Luna.**

After the nine day trial prior to deliberations, "the court in its instruction averred that "all the evidence which were introduced at trial would be turned over to the petit jury". This included "**specific-ally**", the U.S. Currency allegedly stolen from the bank robbery, total-ling approximately **$36,000.00.** Moreover, this specific evidence accor-ding to the evidence solicited by the prosecutor. This U.S. Currency had "**special markings and wrappings**", which required the jury to ex-amine in order to distinguish between "**Bank robbery proceeds, and cur-rency which was or were not proceeds from the robbery".**

This in turn led the jurors to anticipate "identifiable markings", or "special wrappings" around the U.S. Currency as induced at trial. The alleged codefendant "Kevin Hilliard" testified at trial concerning the money seized by FBI Agents from a safe at his house. Approximately **$68,000.00** in cash, some of which "as told to the jurors" still had the bank wrappers around the bundles, in which jurors would alledgedly have an opportunity to "examine" during deliberations.

However, during deliberation, the trial court instructed jurors that ["**within a few minutes after you go to the jury room, we're going to send in "all" the evidence and copies of my instructions as well as the verdict sheets"**] Tr.tr. 1572, **lines 9-11.**

At Tr. tr. page **1576,** the court again at lines 7-8; "**I assume that "all" the exhibits are in".**

Defense counsel "Ravenell", conferring with Ms. Arrington concern-ing "lost exhibits" was told by Ms. Arrington that they had been found.

Although not indicating exactly "what exhibits were lost" or for that matter, "what exhibits were allegedly or subsequently found". **See Tr. tr. p. 1576.**

Then after approximately 16 pages of transcribed record, where some of the conversations were outside the earshot of the defense and jurors, it was subsequently explained "instigated by **"Luna"**, that certain items would not be available to jurors for examination. **See Tr. tr. p 1592, lines 13-21.** And that the jury would use other contents and if they [the jury] have any questions, simply send us a note. Referring to the court and prosecutor. **Tr.tr. 1592 lines 22-25.**

At page **1582**, the jurors requested **"all the evidence"**. At page **1593**, while instructing jurors on the handwritten note, the court again instructed that the money all of a sudden would not be sent in to the jury room. Tr.tr. page 1591, answering inquiry from the jurors.

See the following excerpts of Tr.tr. provided here as exhibits, where it was obvious, Johnathan P. Luna labored tirelessly to keep what was already "stolen" or "missing" out of the reach of the jurors, which if it had been "examined" by jurors, they would have found that the money could not have come from the robbery as alleged.

## ARGUMENT SUPPORTING RULE 33 FOR A NEW TRIAL

Petitioner "Brown" begins by straight-forwardly claiming that his conviction and subsequent sentence was predicated on **"fraud", misconduct"**, and **"structural errors"**, committed by a Assistant U.S. Attorney, Johnathan P. Luna. With malice and aforethought in which he conspired from the initiation of criminal proceedings to mislead the jurors and withhold pertinent exculpatory evidence by **"stealing $36,000.00"** from Petitioner Brown's trial.

This "misconduct" was done not by a non-governmental official, but was executed by a clever calculating plan on behalf of a Assistant U.S. Attorney, that according to the FBI investigations. **Luna had a 'motive' the 'resources', access and "opportunity'**. And in achieving the intended goal of the theft, it deprived Petitioner Brown of a fair trial as guaranteed under the United States Constitution. **See FBI Invst. Exhibits.**

As grounds for the above claim, Petitioner argues that pertinent evidence was "withheld" intentionally, with bad faith under the guise of conducting a trial according to due process of law. And instead of submitted important evidence for which the jury could base its determination, "Luna" submitted falsified documents of "other evidence", to make up for not having the original **$36,000.00 in cash.**

And in such instances, **Rule 1004, of the Federal Rules of evidence,** because of the results of a "bad faith motive", makes the **"other evidence" inadmissible.** Regardless of whether it was **"lost, destroyed or, as in the instant matter; "stolen".** Petitioner also argues that "there is no general rule to withhold introduced trial evidence which does not pose an immediate threat to jurors. Especially whereas the jurors were brought back into court and told that it would not be examining pertinent trial evidence. **See Tr.tr. 1582.**

This withheld evidence, had it been submitted to the jurors as agreed initially by the defense **[$36,000.00]**,"in fact would have exposed the reasonable doubt" in the minds of the jurors that would have altered the outcome of the proceeding. Thus, a conviction based on a "tainted" trial cannot be relid upon as being "confident".

As before mentioned, Mr. "Luna" sent in other evidence consisting of "who knows what" intending to mislead the jurors into finding "Brown" guilty by tainted evidence in violation of **Rule 1004**.

Thus, makes it difficult to exclude any person at this juncture from conspiring with "Luna" to have achieved this goal until a complete development and exhaustion of the FBI probe is completed. But in the meantime, due to the integrity, fairness, and public reputation of the judicial proceeding, this conviction must be vacated. Petitioner "Brown" is not pressing upon this court a need for a new trial based on some alleged misconduct in a unrelated matter. The trial evidence $36,000.-00, was actually keep from the jury and stolen from his trial. Whereas, the number one suspect, according to the investigation by the FBI, points directly to the prosecuting officer.

## SECOND GROUND AND LEGAL ARGUMENT

As Petitioner's second ground for a new trial, Petitioner Brown argue's that the outcome of his trial and conviction cannot stand because it is the result of "structural errors". See <u>Quintero v. Bell</u>, 256 F.3rd 490 (6th Cir. 2001); <u>Shewfelt v. Alaska</u>, 228 F.3rd 1088 (9th Cir. 2000)("Structural errors" call into question the very accuracy of the reliability of the trial process and thus are not amendable to harm-less error analysis, but require "automatic reversal" such as a denial of a jury trial is a structural error subject to automatic reversal)".

Petitioner therefore argues pursuant to the Supreme Court decision in <u>U.S. v. Gaudin</u>, 515 U.S. 506, 132 L.Ed 2nd 444, 115 S.Ct. 2310 (1995), that the "failure to submit entire element of the crime to the jury, when properly preserved request is made, is to be treated as "structural error

(6)

and is "reversible error" without regard to harm. Thus, at trial, $36,000.00, was introduced as a government's exhibit, and accordingly, 18 U.S.C.§2113(a) and (d), namely the alleged stolen currency from the financial establishment "is", for all apparent reasons **"a critical element of the offense"**, in which the jurors were required to examine.

## WITHIN THE FOURTH CIRCUIT, THE LEGAL STANDARD FOR GRANTING A NEW TRIAL BASED ON NEWLY DISCOVERED EVIDENCE

Rule 33 of the Federal Rules of Criminal Procedure authorizes a court to grant a defendant a new trial "if required in the interest of justice". A motion for new trial must be made within three years after the verdict of guilty, which Petitioner previously discussed.

In this Circuit, as in most Circuits, a defendant who seeks a new trial under a Rule 33 motion based on newly discovered evidence must meet a five part test. That test includes the following elements: (a) the evidence must be, in fact, newly discovered, i.e., discovered since the trial; (b) facts must be alleged from which the court may infer diligence on the part of the movant; (c) the evidence relied upon may not be merely cumulative or impeaching; (d) the new evidence must be material to the issues involved; and (e) the new evidence is such, and of such a nature, as that, on a new trial the newly discovered evidence would probably produce an acquittal. **United States v. Cutis**, **988 F.2nd 1355, 1359 (4th Cir. 1993)**.

Although there are "exceptions" to the five listed above, all Circuits however require "automatic reversal" when the motion for a new trial is based on a "structural error". However, Petitioner here also can meet these prongs.

First of which, as the exhibits definitively show, the investigations by the Federal Government, suspecting "Luna" of misconduct while in office was made public after Petitioner's trial. Satisfying (a).

Second, the new facts are such that neither the defendant nor his attorney anticipated the existence of such evidence. Therefore, there was no lack of diligence attributable to the defense.

Third, the evidence impeaches the very foundation of the government's "intergrity in bringing a fair untainted case", and submitting all trial exhibits to jurors". As the Court in **Cutis** notes where a case turns on the testimony of one witness whose credibility is greatly compromised by newly discovered evidence, a new trial should be allowed. See Id. at 1359. See <u>United States v. Atkinson</u>, **429 F.Supp 880,887(E.D. N.C. 1977)(holding that newly discovered evidence that "sufficiently impugns the veracity and credibility" of the uncorroborated testimony of the "only witness who testifies to petitioner's participation" in a drug transaction warranted a new trial).** Moreover, these above examples were reversed because of "non-governmental faults".

In addition, the rule of "automatic reversal applies here" because of the case attacking the very foundation, credibility from start to finish. Mr. Luna's misconduct cannot be relied upon as bringing any just result and his impeachment goes to the heart of this government.

Thus Petitioner "Brown" argues firmly "that he has a Constitutional right and freedom from **"Malicious Prosecution"**. See <u>Kinzer v. Jackson</u>, **316 F.3rd 139 (2nd Cir. 2003)**, or from governmental misconduct. And be it as it stands, "Luna's" conduct raises far above the norm of what Circuit Courts tolerate, at minimum here it warrant a new trial.

See <u>Robinson v. Maynard</u>, 829 F.2nd 150 (10th. Cir. 1987); <u>Reynolds v.</u>
<u>Ellingsworth</u>, 843 F.2nd 712 (3rd Cir. 1088); <u>Freeman v. Cann</u>, 962 F.2nd
1252(7th Cir. 1992); <u>Martire v. Wainwright</u>, 811 F.2nd 1430 (11th Cir. 19-
87).

Especially reminding this court that "this incident cannot be looked
upon with a 'knee-jerk' response that tends to distinguish "Luna's" con-
duct from pre-trial, during or after". The bare facts is that in order
to pull off a theft, planning must first be undertaken. And until date,
the $36,000.00 has yet to be recovered with all evidence pointing di-
rectly to a member of government.

### IN CONCLUSION

Based on the grounds so forwarded, "withholding material exculpa-
tory evidence"; "which was newly discovered to be stolen", "as a direct
result of governmental misconduct", causing "structural errors to Peti-
tioner Brown's trial" hereby warrant **"automatic reversal". And any fur-
ther relief this honorable court deems just and proper.**

**Carefully review** the contents enclosed as exhibits, **i.e., news re-
portings, trial transcripts excerpts, et.al".** Prior to making and de-
termining this case on the merits.


RESPECTFULLY SUBMITTED!

/S/ _____

Nacoe Ray Brown #
U.S.P., Lee County
P.O. Box 305
Jonesville, Va. 24263-0305


CC: Dist. Ct.
    U.S.A.
    file

1   be excused.  I have a few additional instructions for you.

2   First, of course, you'll recall that your first order of

3   business in the jury room will be to select or elect, however

4   you choose to do it, a foreperson.  The foreperson selected by

5   you will earn no extra pay but will simply be your spokesperson

6   here in court when you deliver your verdict, and he or she will

7   preside over your deliberations.  So, you make your decision

8   promptly upon going into the jury room.

9           Within just a few minutes after you go into the jury

10   room, we're going to send in all of the evidence and copies of

11   my instructions as well as the verdict sheets.

12           If at any point hereafter you need to communicate with

13   us about any matter, you must do so only in writing.  If you

14   have a question or an observation or any other matter you need

15   to communicate with us about, simply write out your question or

16   your observation and knock on the door.  The bailiff will be

17   here in the courtroom at all times during your deliberations,

18   so if you need to communicate with us, just knock on the door,

19   and he'll take the note and bring it to me, and we'll get back

20   to you promptly with an answer if it's a question.

21           I may send in a written response to a question, if you

22   send out a question, or, alternatively, we may bring you back

23   into the courtroom, in the jury box, and I will answer your

24   question here in open court.

25           Now, we haven't arranged and probably can't make

use of mobile-communication devices during your deliberations.

So, please disable your pagers and cell phones.  Make no calls,

and respond to no calls during your deliberations.

The jury is excused to begin its deliberations.

(At 10:33 a.m., the jury left the courtroom to

commence deliberations.)

THE COURT:  I assume that all the exhibits are in

order?

MR. LUNA:  We're going to meet with Ms. Arrington.

THE COURT:  Please.  Ms. Arrington and I had a very

bad experience recently, where it took over an hour to get the

exhibits together?

MR. LUNA:  We're not going to do that.

THE COURT:  Frankly, I would prefer that you not wait

until you've gone through all of them before you start sending

them in.  Get through as many as you can within the next couple

of minutes, and then send those in, and then finish looking at

whatever you need to look at, and send those in.  They don't

have to all go in at the same time.

MR. LUNA:  Yes, Your Honor.

THE COURT:  Please take care of that expeditiously.

Mr. Ravenell, did you have a question?

MR. RAVENELL:  Your Honor, I was just conferring with

Ms. Arrington as to whether the exhibit was found that we

couldn't find yesterday and she told me yes.

that note?

THE COURT:  It's 11:05.

MR. RAVENELL:  Thank you.

THE COURT:  It's available to examine if you want to.

MR. RAVENELL:  No, no.  We were here when it came out.

THE COURT:  Okay.  We're in further recess.

(At 11:27 a.m., the recess commenced.)

(At 12:05 p.m., the following colloquy took place.

The defendant was not present.)

THE COURT:  Counsel, we're back on the record in

United States of America v. Nacoe Ray Brown.  Counsel are

present.  The defendant is not present.  The Court has received

a couple of additional notes, but I don't think we need the

defendant to discuss this -- that is to say, I don't think that

Mr. Ravenell is going to need to confer with his client, but if

he should need to or desire to, I'll certainly not make a final

determination as to how to respond to these inquiries until he

has had a chance to confer with Mr. Brown.

MR. RAVENELL:  That's fine, Your Honor.

THE COURT:  At 11:45 a.m., the following note came out

of the jury room, while I was involved in that sentencing you

all just saw me conclude.

Can the jury have a list of all the evidence

entered?

Did we send in the exhibit lists with the evidence?

Page 1582

THE COURT: Yes.

MR. RAVENELL: The numbering I have no problem with, but there may be something on the descriptions.

THE COURT: Yes. Okay.

Let's go to the next note, which is related to that. This note came out at 12:05:

> 1. Can the jurors have all the evidence presented, primarily the White Accounting records?
>
> 2. Was there a second hands-free device entered into evidence?

(There was then a knock on the door from the jury room)

THE COURT: Obviously, I need to bring the jury back into the courtroom. I normally tell them that there were exhibits that were marked for identification or otherwise mentioned that were not admitted into evidence and that the only ones they will get are the ones that are admitted into evidence, and I failed to do that in this instance, so I think I should probably, at a minimum, bring them back into the courtroom and tell them that.

As we've been sitting here, as you all just observed and heard, there was a knock at the door, so now another note has come out. It says:

> Can we have the easel, magic markers, and masking tape?

Belinda, we need Mr. Brown to be brought down.

2    I'm going to bring the jury back into the courtroom

3  and essentially answer all of these questions in one

4  consolidated response.

5    I'm going to tell them that we are preparing a

6  sanitized copy of the exhibit list, that it's going to take a

7  bit of time, but we will get it into them.

8    And I'm going to tell them that they cannot have any

9  exhibits that were marked only for identification, and that, in

10 fact, they have all of the exhibits that have been admitted as

11 evidence in the trial.

12    Is that literally true, by the way?

13    MS. RODRIGUEZ-COSS:  Yes.  Except for 58, which is

14 ready now.

15    THE COURT:  But all the money has gone in, and so

16 forth?

17    MS. RODRIGUEZ-COSS:  No.  Your Honor.

18    THE COURT:  I didn't think you'd send in the money.

19 What money did you not send in?

20    MS. RODRIGUEZ-COSS:  We didn't send in any of the

21 money.

22    THE COURT:  None of the money.  Okay.

23    MS. RODRIGUEZ-COSS:  Also, we didn't send in the

24 pellet gun, and we didn't send in the pellets.

25    THE COURT:  Nor should you.

admitted into evidence.  And so, any document or other exhibit that was marked for identification during the trial, but not formally admitted into evidence, is not available to you because it's not a part of the evidence of the case.

Now, you've asked in one of your notes:

Can the jury have a list of all the evidence entered?

We are working on preparing an exhibit list, both for the government's exhibits and the defense exhibits.  That will take a few additional moments.  We're going to send in a clean copy of the exhibit list, but as I say, that will take a few moments.  The exhibit list in some parts contain certain descriptions that you might or might not find helpful, and so we're going to send that list in to you so that you can use it to try to keep track of the exhibits.

So, that's one question.

You also asked:

Can we have the easel, magic markers, and masking tape?

I assure you can.  I think we pretty much have that for you now, and it should be brought in to you very, very shortly after I excuse you.

There's also this question:

Can the jurors have all the evidence presented, primarily the White Accounting records?

I think we all know what you're referring to by the

White Accounting records.  Those records were not admitted into

evidence.  You'll recall that, in fact, we had sort of an

exchange about the documents and all of that, when certain

documents were shown to Agent Campano.  Not one of those

records was moved into evidence in this case.  So, they are not

a part of the evidence.  And so, as I said a moment ago, any

document, whether or not it was referred to here in the

courtroom, if it was not admitted into evidence, it is not

available for your consideration, you should not consider it,

and you should not speculate about any such document or other

exhibit.

We have sent in to you, with a couple of exceptions,

all of the evidence that was admitted in this case.  We didn't

send in the money, we didn't send in the exhibit which was

described as the pellet gun, and we didn't send in the jewelry

that was identified.  I think, frankly, the reason we didn't

send in those exhibits is pretty obvious.  There are certain

exhibits that we simply don't, under court procedures, allow

out of the possession of the United States Attorney's Office

and the FBI.

If you need to examine any exhibit that was not sent

in to you, as I indicated with respect to the CD-Rom that

contained certain images, if you want to examine any evidence

that was admitted but not sent in, simply send us a note that

Luna's penknife

baltimoresun.com

Feb. 13, 2004

//www.baltimoresun.com/news/local/bal-md.luna13feb13,1,278209.story

# Search uncovers Luna's penknife

## Federal prosecutor, 38, was likely stabbed with it, investigators believe

By Gail Gibson
Sun Staff

February 13, 2004

Authorities probing the mysterious death of Baltimore federal prosecutor Jonathan P. Luna now think the young lawyer likely suffered from stab wounds inflicted with his own pocketknife and are re-examining financial records that may shed more light on the final months of Luna's life.

In a recent recanvassing of the rural Pennsylvania field where Luna's body was found, investigators found a penknife that they believe caused his wounds, according to two federal law enforcement sources. They also said that investigators believe the pocketknife is the one that Luna regularly carried.

Luna was stabbed 36 times and found Dec. 4 facedown in a shallow creek in rural Lancaster County, Pa., where authorities said he drowned. His Honda Accord was nearby, its engine running.

It was not known yesterday whether authorities found fingerprints or blood on the knife, or why the weapon was not discovered during an extensive search of the scene on the day Luna was found.

The discovery of the knife comes as investigators also have sought help analyzing medical and psychological evidence from a well-regarded military forensics unit as they struggle with a new, competing theory about one of the most basic questions in the case: whether Luna was the victim of a homicide or suicide.

In FBI reports over the past month, authorities have raised the possibility that Luna, 38, could have killed himself, according to three law enforcement sources who spoke with The Sun on condition of anonymity. The controversial theory has met sharp skepticism internally, however, by a number of investigators who maintain that the evidence points to homicide.

Officials with the FBI's Baltimore field office, which has headed the investigation, have declined to comment on any of the theories that authorities are pursuing to solve the mystery of Luna's death.

"All I can say is the investigation continues," said Special Agent Barry Maddox, a spokesman for the office.

Luna's boss, Maryland U.S. Attorney Thomas M. DiBiagio, has not commented on the investigation since the night that it began, when he said preliminary evidence suggested Luna had been murdered. Vickie E. LeDuc, a spokeswoman for the prosecutor's office, also declined to comment, as has Luna's family.

energetic and well-liked young prosecutor, who was married and had two young sons, was due in federal court in downtown Baltimore to conclude a drug case on the day that he was found dead. But investigators found no evidence that his death was related to his work, and instead have closely combed Luna's personal life for clues.

## Loan application

In recent days, investigators have again turned their attention to the unsolved disappearance of about $36,000 introduced as evidence in a bank robbery trial that Luna prosecuted in September 2002. Authorities have not linked the missing cash to Luna or to his death, but investigators now are examining a loan application that Luna filled out online about the time of the trial.

The loan application was for about $30,000, and it was canceled not long after the period when the evidence money was discovered missing, according to a federal law enforcement source. Authorities have determined that at the time of his death, Luna had credit card debts of about $25,000 -- and that he had as many as 16 credit card accounts, some that he held without his wife's knowledge.

In addition to financial troubles, Luna also had felt that he was on the outs with his supervisors in the U.S. attorney's office, where he had worked for four years. Several legal sources have said that Luna was concerned he might have to change jobs. DiBiagio has rejected any suggestion that Luna was at risk of being fired.

The highly sensitive question of whether Luna could have killed himself is at the center of a debate among investigators about the direction of the case, as it stretches into a third month with no arrests. To better develop the theory, investigators have asked the Armed Forces Institute of Pathology to examine medical and psychological evidence in the case.

A spokesman for the institute referred all questions about the Luna case to the Baltimore FBI office.

Autopsy findings by the medical examiner in Lancaster County, Pa., have not been made public, and forensic pathologist Dr. Wayne K. Ross, who performed the autopsy, has refused to discuss the case. However, the county's then-coroner, Dr. Barry Walp, said in the first days of the investigation that Luna had suffered a number of shallow "prick" marks on his chest and neck in addition to several deeper, more serious stab wounds.

While rare, there are some high-profile instances of suicides by stabbing, cases frequently marked by so-called "hesitation wounds" that barely penetrate the skin. In 1999, Army officials ruled that a National Guard captain found dead at a Kentucky base with 26 stab wounds to the neck and chest was a suicide, a finding that was disputed by the soldier's family.

More recently, the stabbing death in December of Oscar-nominated singer-songwriter Elliott Smith -- initially thought to be a suicide -- remains an open question after the Los Angeles coroner's office said it could not determine whether stab wounds to Smith's chest were most likely inflicted by him or by someone else.

If authorities conclude that Luna's death was a suicide, the finding could open investigators to allegations that they simply failed to solve the high-profile case.

Already, the case has been marked by competing jurisdictional issues between authorities in Pennsylvania and Maryland. In addition, officials in Washington are investigating whether some

Luna's penknife

...sors in the FBI's Baltimore office overreached in questioning a female agent in connection with ...una case, a law enforcement source has told The Sun.

## Internal probe

The Justice Department's Office of Professional Responsibility has opened an investigation into whether supervisors improperly questioned an agent who had worked on several cases with Luna about her personal life and told her to turn over her computer for inspection, the source said.

The internal investigation was first reported Wednesday evening by CBS News.

A federal law enforcement official said yesterday that there has been no finding in the internal probe and emphasized that investigators never considered the agent a suspect in Luna's death -- "nor have they developed any suspect," the source said.

In Luna's case, sources have described evidence that appears to run counter to a suicide theory. Officials have said that some of Luna's wounds appear to be defensive and have said that authorities found evidence of a second blood type in Luna's Honda Accord, possibly from an attacker.

Investigators also found blood on the Pennsylvania Turnpike toll ticket that they believed was turned in in rural Ephrata, Pa., when Luna's car exited the highway on the night he was killed. The ticket suggested to investigators the possibility that someone other than Luna was driving the car when it entered and left the Pennsylvania Turnpike because Luna's car had an EZ Pass card, something a driver unfamiliar with the vehicle might not have known.

In the two months since Luna's death, agents also have pored over Luna's financial records, computer files, phone logs and personal contacts in his Palm Pilot, but none of the information has led authorities to a potential suspect.

*Copyright* © 2004, *The Baltimore Sun*

# Missing money noted in probe

## Cash evidence in '02 case Luna handled vanished; Prosecutor's death investigated; FBI agents examining work files of lawyer, 38

By Gail Gibson and Lynn Anderson
Sun Staff

December 10, 2003

As investigators try to solve the slaying of a Baltimore federal prosecutor, they are taking a second look at another mystery: the disappearance of about $36,000 in cash introduced as evidence in a bank robbery trial the lawyer prosecuted last year.

Law enforcement sources said yesterday that FBI agents are reviewing the unsolved case of the missing money as they search for clues in the mysterious killing of Assistant U.S. Attorney Jonathan P. Luna, who was stabbed 36 times and left in a Pennsylvania creek.

The sources cautioned that nothing links Luna, 38, to the missing cash, or the money to his slaying. But the case stands out among Luna's files, all of which were being closely examined as authorities continued to search for suspects in Thursday's killing.

Funeral arrangements for Luna, a well-liked, energetic young lawyer and married father of two, remained incomplete yesterday. Authorities in Lancaster County, Pa., were expected to hold his body until Friday, in part because Luna's wounds -- including what two law enforcement sources described yesterday as ligature marks indicating that his wrists had possibly been bound or held -- could yield important clues about his death.

Investigators think the slaying was the result of a personal relationship that turned violent, and was not a random crime or connected to Luna's work as a prosecutor. Authorities have developed a timeline of his whereabouts in the hours before his death, but they have not identified a suspect or determined whether it would be a state or federal crime.

"First we have to know who did this and why," Lancaster County District Attorney Donald R. Totaro said yesterday in a brief interview at his office.

An autopsy report in the case has not been made public, and forensic pathologist Wayne K. Ross, who performed the examination, has refused to comment. But law enforcement sources said that injuries to Luna's genital area and indications that he might have been restrained have led investigators to believe the motivation behind the crime was highly personal.

Investigators are examining Luna's personal relationships with women and possible financial problems. A law enforcement source said Monday that Luna had about $25,000 in credit card debt.

Luna was reported missing after he returned from home to the federal courthouse in downtown Baltimore late Dec. 3 to complete paperwork for an expected plea agreement the next morning in a drug conspiracy

trial. Authorities think he left the courthouse about 11:30 p.m. and traveled toward Philadelphia willingly -- stopping to withdraw cash at one point and to gas up his car at another.

His body was discovered just before dawn Thursday morning, next to his blood-smeared Honda Accord in a field just off the Pennsylvania Turnpike in rural Brecknock Township about 75 miles from Philadelphia.

While authorities have focused in recent days on gathering information about Luna's personal life, among his work files being reviewed, the bank robbery trial from last year stands out because of the unsolved crime it produced.

In that case, at least $36,000 was determined to be missing as lawyers wrapped up a three-week bank robbery trial in U.S. District Court against a Baltimore man named Nacoe Ray Brown, who was charged in four Baltimore County robberies that gained attention for their harsh violence, the more than $450,000 the crimes netted and the robber's many disguises:

In one robbery, the gunman wore hospital scrubs; in another, a suit and black fedora.

When investigators arrested Brown and another man, Kevin Hilliard, they found a safe containing about $68,000 in cash. That money -- kept heat-sealed in two or three bulky plastic bags -- was shown to the jury at Brown's trial

In interviews last fall, U.S. District Judge Andre M. Davis, who presided over the case, and law enforcement sources indicated that one bag of money apparently was lost somewhere in transit between the courtroom and a government storage area used to hold sensitive evidence during trials.

Federal prosecutors and the FBI agents assigned to the case would have been directly responsible for the money. A stipulated agreement that all exhibits in the case had been properly returned was signed on the last day of the trial by each of the attorneys in the case -- Luna and his co-counsel, Jacabed Rodriguez-Coss, and defense attorney Kenneth W. Ravenell.

Ravenell said in an interview at the time that the money was in the courtroom only briefly. After it was produced as evidence, he said that he understood it was taken to a safe in the building by the government agents or attorneys.

Officials with the U.S. attorney's office have never commented on the case, and spokeswoman Vickie E. LeDuc said yesterday that she could not comment on the investigation and could not confirm or deny that it was being reviewed in connection with the Luna probe.
In Pennsylvania, Totaro also declined to comment.
Special Agent Barry Maddox, a spokesman for the FBI's Baltimore field office, said yesterday that the missing money case remained unsolved. He said he could not comment on that probe's possible connection to the Luna case.
"We're going to try to look at everything we can to try to find the missing link, so to speak -- the missing piece of the puzzle," Maddox said.
Ravenell and Davis said yesterday that they had not been questioned by federal agents about the missing money since Luna's disappearance. Davis said that the FBI had launched an exhaustive probe when the cash was discovered missing. The judge said he was interviewed twice, and as recently as last spring had provided an agent investigating the case with a complete trial transcript.

Sun staff writer Gus G. Sentementes contributed to this article.

# Maryland's U.S. Attorney To Step Down

### Thomas DiBiagio To Return To Private Law Practice In 2005

*Greg Ng, Staff Writer*
POSTED: 3:37 pm EST December 3, 2004
UPDATED: 7:09 pm EST December 3, 2004

**BALTIMORE --** Maryland's top federal prosecutor announced Friday that he plans to step down early next year.

WBAL-TV 11 News I-Team lead investigative reporter Jayne Miller spoke with DiBiagio just after 5 p.m. Friday, who said the decision to step down was his alone.



"When I started, I promised my wife one term. So this is no surprise, this is a personal decision I made this summer. This is a personal decision I made to keep to my wife," DiBiagio said.

Just before 3:30 p.m., U.S. Attorney Thomas DiBiagio's office released a statement Friday stating that DiBiagio will step down and return to the private law practice early next year.

"I am extremely grateful to the president for giving me the opportunity to serve as the United States attorney for Maryland. It has been an eventful and successful three years, marked by numerous achievements and accomplishment of the goals I set for the office.

"This office has an outstanding record of prosecuting significant cases involving public corruption, white collar crime, violent criminal organizations, international drug trafficking and child exploitation.

"I have hired two dozen highly qualified lawyers, the best of the best, and they are aggressively investigating and prosecuting these cases side by side with the outstanding veteran lawyers of the office.

"We have relentlessly pursued through both criminal and civil sanctions those who would cheat the government and the taxpayers. In the aftermath of the tragic events of Sept. 11, 2001, we have established one of the leading anti-terrorism programs in the country.

"I have strived to obtain justice for all, without fear or favor. However, after three years, it is apparent that it is in the best interest of my family for me to step down and return to the career in the private sector that I put on hold when I was asked to serve as United States attorney."

In November, the U.S. Department of Justice sent investigators to Baltimore to interview federal prosecutors about DiBiagio's job performance. The investigation was apparently sparked after *The Baltimore Sun* published e-mail messages that DiBiagio had written to his staff, urging them to make "front page" indictments in political corruption cases.



Video

Jayne Miller Reports: DiBiagio Decides To Step Down As Promise To Wife

In July, the state's Democratic party called for DiBiagio's resignation over internal documents calling for high-profile corruption indictments.

DiBiagio will be remembered for two high-profile prosecutions of former Baltimore City police Commissioner Ed Norris and investment banker Nate Chapman.

Norris' attorney, upon learning of DiBiagio's resignation, described DiBiagio as a very aggressive prosecutor who "sometimes let zeal get in the way of his legacy," Miller reported.

When asked about this record while in office, DiBiagio told Miller: "We've got a three-year record and that record is absolutely fantastic, outstanding prosecutions in violent, drug traffic and white collar [crimes]."

President George W. Bush will appoint DiBiagio's replacement with input from Maryland Gov. Bob Ehrlich.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

NACOE RAY BROWN,
    Movant

        v.

UNITED STATES of AMERICA,
    Respondent

:
:
:
:
:
:
:

CRIMINAL NO. AMD 01-0377
CIVIL NO. AMD 04-3500

...oOo...

## O R D E R

For the reasons stated in the foregoing Memorandum Opinion, it is this 5th day of

April, 2006, by the United States District Court for the District of Maryland ORDERED

that:

    1.      The motion to vacate judgment pursuant to 28 U.S.C. §2255 is DENIED;

and it is further ORDERED

    2.      The motion for a new trial is DENIED; and it is further ORDERED

    3.      The Clerk SHALL CLOSE THIS CASE and TRANSMIT a copy of this

Order and the foregoing Memorandum Opinion to counsel for the United States and to

movant, pro se.

Andre M. Davis
United States District Judge



IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

NACOE RAY BROWN,
Movant

v.

UNITED STATES of AMERICA,
Respondent

:
:
:
:
:
:
:

CRIMINAL NO. AMD 01-0377
CIVIL NO. AMD 04-3500

...oOo...

MEMORANDUM OPINION

Nacoe Ray Brown, who was convicted after a two week jury trial of bank robbery,

has filed a timely "Motion to Vacate, Set Aside, or Correct Illegal Sentence" pursuant to 28

U.S.C. § 2255, and a motion for a new trial based on "newly discovered evidence" pursuant

to Fed.R.Crim.P. 33. The government has filed its response to the former. No hearing is

necessary.

I.

Brown was indicted on four counts of bank robbery and he was convicted on three

of the counts (the jury failed to reach a verdict as to one count). The substantial direct and

circumstantial evidence produced by the government at trial included the following: (1) the

testimony of Brown's accomplice, who pled guilty pursuant to a cooperation plea agreement;

(2) evidence seized pursuant to search warrants from the residences of the accomplice

(including more than $60,000 in bank robbery proceeds) and Brown (including theatrical

costumes and related paraphernalia worn during the robberies); (3) numerous identifications

of Brown by witnesses/victim tellers; (4) testimony and evidence surrounding law enforcement officers' surveillance of Brown and his accomplice and their arrest in advance of a planned bank robbery; and (5) video depictions of three of the robberies showing Brown committing the crimes. As the bank robberies were all "vault jobs" the total loss exceeded a quarter of a million dollars.

Brown's retained counsel put on a vigorous defense in the face of overwhelming evidence of guilt, including his conduct in an extended pre-trial evidentiary hearing in connection with motions to suppress evidence, his cross-examination of government witnesses, and his arguments to the jury designed to show weaknesses in the government's mosaic of proof. Counsel's efforts were not aided when, during his pre-trial incarceration, Brown attempted to escape from the local detention center in which he had housed by the United States Marshal (an attempt for which he was indicted), thereby opening the door to the admission of "consciousness of guilt" evidence, including the testimony of his accomplice in the escape attempt, who was herself also indicted and pled guilty.

Brown appealed. The United States Court of Appeals for the Fourth Circuit affirmed his convictions and 25 year sentence.

## II.

In his motion to vacate, Brown has asserted three grounds for relief: (1) that his sentence is illegal because he was sentenced for armed bank robbery pursuant to 18 U.S.C.

2

§ 2113(a),(d) although he used a toy weapon; (2) prosecutorial misconduct depriving him of a fair trial; and (3) ineffective assistance of counsel (in numerous respects). Examination of these claims reveals that he is entitled to no relief as to any of them.

III.

A

Brown's assertion that because he employed a toy weapon in committing the robberies he is not subject to an enhanced penalty for bank robbery is simply incorrect. *See United States v. Hamrick,* 43 F.3d 877, 882-83 (4th Cir.1995) (unloaded, inoperable, or fake weapon may constitute dangerous weapon for purposes of armed bank robbery statute) (citing *McLaughlin v. United States,* 476 U.S. 16, 17-18 & n. 3 (1986)); *United States v. Garrett,* 3 F.3d 390 (11th Cir.1993)(toy gun)(per curiam), *cert. denied,* 510 U.S. 1130 (1994).[1]

B

The claim of prosecutorial misconduct (which also is the basis for the motion for new trial based on newly-discovered evidence) arises from the following circumstances.

The government briefly introduced during its case-in-chief the bank robbery proceeds

---

[1]The court instructed the jury as follows: "If you find beyond a reasonable doubt that the defendant displayed a weapon, you need not consider whether the weapon was loaded or whether the weapon was operable; the law requires only that the defendant display the weapon. *Furthermore, it is not a defense to this element that the weapon was not a real weapon, as long as it appeared to those present to be a dangerous weapon.*"

3

that had been seized from a safe in the apartment of Brown's accomplice. The cash had been counted and then packaged in three heat-sealed, see-through plastic containers, in which condition they were displayed to the jury. At some point as the end of the trial neared, one of the three packages of cash went missing and has never been recovered. The FBI has conducted (and apparently continues to conduct) a formal investigation into the loss of this evidence.

Drawing on media reports that have suggested that one of the Assistant United States Attorneys who prosecuted this case, now deceased, may have come under suspicion in connection with the missing evidence, Brown asserts that the circumstances surrounding the missing evidence give rise to a claim of prosecutorial misconduct, and that he was therefore deprived of a fair trial. This conclusory claim is not merely without merit, as asserted by Brown it is essentially incoherent and will not be further discussed.[2]

## C.

Finally, relying on the circumstances of the missing robbery proceeds, Brown has attempted to convert his argument of prosecutorial misconduct into claims of ineffective

---

[2]The most coherent strand of Brown's claim of prosecutorial misconduct based on the missing evidence seems to be his assertion that the jury was deprived of an opportunity to see the cash during deliberations, and in particular, to determine whether the wrappers around the stacks of cash bore the stamp of the victim banks. The jury saw this evidence and heard testimony regarding it during trial, most particularly from Brown's accomplice, who admitted that he stored his share of the robbery proceeds in a safe in his apartment. It is clear beyond a doubt that Brown was not prejudiced by the fact that one of the three plastic containers of cash turned up missing at the end of the trial.

4

assistance of counsel. That is, Brown contends that his lawyer either failed to inform him promptly of the missing evidence or, assuming (as counsel contends) that counsel learned that the evidence was missing at a later time than Brown asserts, that counsel failed: (1) to seek discovery on this issue; (2) to "cross examine" the prosecutors on this issue; (3) to brief and argue on appeal such issues; and, in other ways, (4) failed to make tactical or strategic use of the missing evidence in his representation of Brown at sentencing or on appeal.[3]

Claims of ineffective assistance of counsel are considered under the familiar standards of *Strickland v. Washington*, 466 U.S. 668 (1984). Under *Strickland*, Brown has the burden of demonstrating (1) the attorney's performance was inadequate to the point where it was not "within the range of competence demanded of attorneys in criminal cases" and (2) there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 687-94.

To the extent they are coherent at all, Brown's fantastic theories concerning the missing evidence and its alleged impact on the reasonableness of his counsel's performance or on the fairness of his trial and its outcome do not come near a showing sufficient to establish a claim under *Strickland*. Counsel correctly determined that the missing evidence was irrelevant to his task of attempting to obtain a more favorable outcome of the

---

[3]Brown also relies on the "toy gun" issue to craft certain allegations of ineffective assistance of counsel. These claims fare no better as ineffective assistance claims as they do under a due process rubric.

5

proceedings on Brown's behalf.

IV.

Each of Brown's claims under 28 U.S.C. § 2255 lacks merit, as does his motion for

a new trial.[4] Accordingly, the motions to vacate and for a new trial shall be denied. An Order

follows.

Filed: April 5, 2006

ANDRE M. DAVIS
UNITED STATES DISTRICT JUDGE

---

[4]To be sure, Brown also asserts that he instructed his counsel to file an application for a
writ of *certiorari* in the Supreme Court of the United States and that counsel failed to do so. The
court concludes that in its judgment, even crediting this assertion by Brown, there is no
reasonable likelihood that any professionally defensible application for writ of *certiorari* filed
with the Supreme Court based on the record in this case would have been granted. In any event,
Brown cannot be unconstitutionally deprived of that which the Constitution does not provide. *See
Ross v. Moffitt*, 417 U.S. 600 (1974)(holding that the federal constitution does not afford a right
to counsel in connection with a request for discretionary review).

6

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

APR 19 2006

NACOE RAY BROWN,

             Petitioner,

    vs.

UNITED STATES OF AMERICA,
             Respondent.

Criminal No.   AMD 01-0377
Civil No.      AMD 04-3500

NOTICE OF APPEAL

    NOW COMES the petitioner, Nacoe R. Brown, filing pro-se, who respectfully files within this Honorable Court this Notice of Appeal from the denial of his 28 U.S.C. §2255 motion and Rule 33 motion, denied on April 5, 2006.

                        Respectfully submitted,

4-16-06

DATE

Nacoe R. Brown
Reg. No. 34730-037
United States Penitentiary Lee County
P.O. Box 305
Jonesville, VA  24263-0305

cc:  Rod J. Rosenstein, U.S. Attorney
     District of Maryland
     36 South Charles Street, 4th Floor
     Baltimore, MD  21201



**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————————

No. 06-6770

———————————

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

NACOE RAY BROWN,

Defendant - Appellant.

———————————

Appeal from the United States District Court for the District of Maryland, at Baltimore. Andre M. Davis, District Judge. (1:01-cr-00377-AMD; 1:04-cv-03500-AMD)

———————————

Submitted: September 28, 2006          Decided: October 10, 2006

———————————

Before NIEMEYER, TRAXLER, and SHEDD, Circuit Judges.

———————————

Dismissed by unpublished per curiam opinion.

———————————

Nacoe Ray Brown, Appellant Pro Se.   Rod J. Rosenstein, United States Attorney, Baltimore, Maryland, for Appellee.

———————————

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

PER CURIAM:

Nacoe Ray Brown seeks to appeal the district court's order denying relief on his 28 U.S.C. § 2255 (2000) motion. The order is not appealable unless a circuit justice or judge issues a certificate of appealability. 28 U.S.C. § 2253(c)(1) (2000). A certificate of appealability will not issue absent "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2) (2000). A prisoner satisfies this standard by demonstrating that reasonable jurists would find that any assessment of the constitutional claims by the district court is debatable or wrong and that any dispositive procedural ruling by the district court is likewise debatable. Miller-El v. Cockrell, 537 U.S. 322, 336-38 (2003); Slack v. McDaniel, 529 U.S. 473, 484 (2000); Rose v. Lee, 252 F.3d 676, 683-84 (4th Cir. 2001). We have independently reviewed the record and conclude that Brown has not made the requisite showing. Accordingly, we deny a certificate of appealability and dismiss the appeal. We dispense with oral argument because the facts and legal contentions are adequately presented in the materials before the court and argument would not aid the decisional process.

<u>DISMISSED</u>

- 2 -

JUDGMENT

FILED: October 10, 2006

UNITED STATES COURT OF APPEALS

for the

Fourth Circuit


No. 06-6770
1:01-cr-00377-AMD
1:04-cv-03500-AMD


UNITED STATES OF AMERICA

        Plaintiff - Appellee

  v.

NACOE RAY BROWN

        Defendant - Appellant


--------------------
Appeal from the United States District Court for the
District of Maryland at Baltimore
--------------------


In accordance with the written opinion of this Court filed this day, the Court denies a certificate of appealability and dismisses the appeal.

A certified copy of this judgment will be provided to the District Court upon issuance of the mandate. The judgment will take effect upon issuance of the mandate.


/s/ Patricia S. Connor
_____
CLERK

**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————————

No. 06-6770

———————————

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

NACOE RAY BROWN,

Defendant - Appellant.

———————————

Appeal from the United States District Court for the District of
Maryland, at Baltimore. Andre M. Davis, District Judge. (1:01-cr-
00377-AMD; 1:04-cv-03500-AMD)

———————————

Submitted: September 28, 2006        Decided: October 10, 2006

———————————

Before NIEMEYER, TRAXLER, and SHEDD, Circuit Judges.

———————————

Dismissed by unpublished per curiam opinion.

———————————

Nacoe Ray Brown, Appellant Pro Se.   Rod J. Rosenstein, United
States Attorney, Baltimore, Maryland, for Appellee.

———————————

Unpublished opinions are not binding precedent in this circuit.
See Local Rule 36(c).

PER CURIAM:

Nacoe Ray Brown seeks to appeal the district court's order denying relief on his 28 U.S.C. § 2255 (2000) motion. The order is not appealable unless a circuit justice or judge issues a certificate of appealability. 28 U.S.C. § 2253(c)(1) (2000). A certificate of appealability will not issue absent "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2) (2000). A prisoner satisfies this standard by demonstrating that reasonable jurists would find that any assessment of the constitutional claims by the district court is debatable or wrong and that any dispositive procedural ruling by the district court is likewise debatable. <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 336-38 (2003); <u>Slack v. McDaniel</u>, 529 U.S. 473, 484 (2000); <u>Rose v. Lee</u>, 252 F.3d 676, 683-84 (4th Cir. 2001). We have independently reviewed the record and conclude that Brown has not made the requisite showing. Accordingly, we deny a certificate of appealability and dismiss the appeal. We dispense with oral argument because the facts and legal contentions are adequately presented in the materials before the court and argument would not aid the decisional process.

<u>DISMISSED</u>

- 2 -

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

NOTICE OF JUDGMENT
October 10, 2006

TO:       Rod J. Rosenstein, Esq.
        Nacoe Ray Brown

Judgment was entered this date in Case Number(s):   06-6770

The Court's decision is enclosed.

PETITION FOR REHEARING (FRAP 40)
PETITION FOR REHEARING EN BANC (FRAP 35)

Filing
Time

A petition must be received in the clerk's office within 14 days after judgment to be timely. There are three exceptions to this rule:

(1)  In all civil cases in which the United States or an agency or officer thereof is a party, any petition for rehearing must be received in the clerk's office within 45 days after entry of judgment.

(2)  The Court may grant an extension of time or leave to file a petition for rehearing out of time if the party establishes that the delay resulted from the death or serious illness of counsel or a family member (or of a party or family member in pro se cases) or other circumstances wholly beyond the control of counsel or a party proceeding without counsel.

(3)  Prisoner petitions are deemed filed when delivered to prison authorities.

If a petition for rehearing en banc is to be filed, it must be filed at the same time and in the same document as the petition for rehearing and must be clearly identified in the title.

Each case number to which the petition applies must be listed on the petition, even in companion or consolidated cases. Failure to list the individual case numbers on the petition will result in the unidentified cases proceeding to mandate even if a timely petition for rehearing has been filed in a companion or consolidated case.

A timely filed petition for rehearing or petition for rehearing en banc will stay the mandate and toll the running of time for filing a petition for writ of certiorari.

Purpose

A petition should only be made to direct the Court's attention to one or more of the following situations:

1. A material fact or law overlooked in the decision.
2. A change in the law which occurred after the case was submitted and which was overlooked by the panel.
3. The opinion is in conflict with a decision of the United States Supreme Court, this Court, or another court of appeals, and the conflict is not addressed in the opinion.
4. The proceeding involves one or more questions of exceptional

importance.

Statement
of Counsel

A petition shall contain an introduction stating that, in
counsel's judgment, one or more of the situations exist as
described in the above "Purpose" section.  The points to be
raised shall be succinctly listed in the statement.

Form

The 15 page limit allowed by the Rule shall be observed.  The
Court requires 4 copies of the petition (20 copies of a
petition for rehearing en banc), and a copy of the Court's
opinion must be attached to each copy of the petition.

## BILL OF COSTS (FRAP 39)

Filing
Time

A party to whom costs are allowed, who desires taxation of costs,
shall file a bill of costs on or before 10/24/06.

## MANDATE (FRAP 41)

Issuance
Time

In original proceedings before this Court, there is no mandate.
Unless the Court shortens or extends the time, in all other
cases, the mandate issues 7 calendar days after the expiration
of the time for filing a petition for rehearing.  A timely
petition for rehearing, petition for rehearing en banc, or motion
to stay the mandate will stay the issuance.  If the petition or
motion is denied, the mandate will issue 7 calendar days later.
If a stay of mandate is sought, only the original of a motion
need be filed.

Stay

A motion for stay of the issuance of the mandate shall not be
granted simply upon request.  Ordinarily the motion will be denied
unless it would not be frivolous or filed merely for delay and
would present a substantial question or otherwise set forth good
or probable cause for a stay.

## CRIMINAL CASES (Plan in Implementation of the CJA)

Criminal

In criminal cases, counsel must inform the defendant in writing
of the right to file a petition for writ of certiorari from an
adverse decision of this Court.  Counsel appointed under the
Criminal Justice Act must file their vouchers within 60 days
of entry of judgment, denial of a petition for rehearing, or the
grant or denial of a petition for writ of certiorari, whichever
is later.

## PETITION FOR WRIT OF CERTIORARI  (Sup.Ct.R. 13)

Filing
Time

Review on writ of certiorari is not a matter of right, but of
judicial discretion, and will be granted only for compelling
reasons.  The petition must be filed in the United States
Supreme Court within 90 days of this Court's entry of judgment.
The time does not run from the issuance of the mandate.  If a
petition for rehearing is timely filed, the time runs from the
denial of that petition.  Content, fees, and number of copies of
a petition for writ of certiorari are governed by the Rules of
the United States Supreme Court.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

NACOE RAY BROWN,         )  CASE NOS. AMD-04-3500;
     Petitioner,      )  (Related Criminal No. AMD-
                      )  01-377) JFM-11-1166
     v.              )  Judge Fredrick Motz
                      )
UNITED STATES OF AMERICA,  )  AFFIDAVIT & DECLARATION
     Respondent.      )  OF NACOE RAY BROWN

NOW COMES the Affiant, Nacoe Ray Brown, a citizen of the United States and the State of West Virginia, over the age of 21 years, and declares as follows under penalty of perjury:

1.¶ On or about September 26, 2002, during the trial proceedings, while the jury was in deliberations, a request by the jury to view all evidence was made to Judge Davis;

2.¶ Judge Davis did not send in the evidence in question;

3.¶ After the verdict but before sentencing, it was discovered that the evidence that had been requested by the jury during their deliberations was missing;

4¶ Also, the stipulation as to the presence of evidence made by Attorney - Kenneth Ravenell and the AUSA Johnathan P. Luna; which supplied proof as to an essential element of the crime, was a fraud upon the court. It was later discovered that the evidence stipulated to was stolen.

5.¶ On or about September 26, 2002, up to and including October 2002, the FBI commenced an investigation regarding the missing evidence;

6. ¶ On or about December 2002, during my sentencing, Judge Davis, my attorney Kenneth Ravenell, and AUSA Johnathan P. Luna were careful to avoid putting on the record, that during sentencing, their was an investigation being conducted by the FBI concerning what had become exculpatory evidence;

7.¶ The chain of custody was broken, thereby putting into question the integrity of all admitted evidence;

8.¶ During the investigation, my sentencing continued and AUSA Luna, Judge Davis, and my attorney Kenneth Ravenell were part of that investigation;

9.¶ During the investigation, my direct appeal and §2255 habeas motion was denied without the record reflecting this investigation for appellate or collateral post-conviction relief purposes;

10.¶Also during this investigation, AUSA Luna was involved in another criminal case, on or about December 2003, that involved prosecutorial misconduct in the form of Brady violations, namely, United States v. Smith-Poindexter; trial transcript dated December 2, 2003, before Judge William Quarles Jr; thus evincing a pattern;

11.¶ During the investigation, AUSA Luna's unfortunate and untimely death was discovered, just before his scheduled polygraph test was to be conducted, concerning the missing evidence;

with his supervisors at work and might have to change jobs;

13.¶ Since I discovered that this investigation was closed, I have consistently sought to obtain additional discovery from both Judge Davis and the succeeding AUSA regarding the missing evidence investigation for appeal purposes. To date, I have not had the privilege of reviewing a solitary piece of information from this investigation, which breaches the AUSA's duty of disclosure under Rule 16(c)(1) & (2) of the Federal Rule of Criminal Procedure.

The inconsistencies that surrounds my sentencing and subsequent appeal, have destroyed the integrity of my due process. These inconsistencies have created a high profile natured matter, which caused officers of the court to cover-up such inconsistency at the expense of due process according to the Fifth Amendment to the United States Constitution, i.e., sentencing, appeal, and §2255 proceedings.

Further Affiant says nought.

<u>Affiant Signature</u>

<u>NOTARY SEAL</u>

Sworn to and subscribed before me this ⎸ day of February 2012.

My Commission Expires: 10/18/2020

<u>Notary Public</u>



OFFICIAL SEAL
STATE OF WEST VIRGINIA
NOTARY PUBLIC
CRISSY D. OXFORD
FCI McDOWELL
101 FEDERAL DRIVE
WELCH, WV 24801
My commission expires October 18, 2020

FILED: July 3, 2012

## UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

No. 12-6757,     US v. Nacoe Brown
1:01-cr-00377-JFM-1

------------------------

### NOTICE OF JUDGMENT

------------------------

Judgment was entered on this date in accordance with Fed. R. App. P. 36. Please be advised of the following time periods:

**PETITION FOR WRIT OF CERTIORARI:** To be timely, a petition for certiorari must be filed in the United States Supreme Court within 90 days of this court's entry of judgment. The time does not run from issuance of the mandate. If a petition for panel or en banc rehearing is timely filed, the time runs from denial of that petition. Review on writ of certiorari is not a matter of right, but of judicial discretion, and will be granted only for compelling reasons. (www.supremecourtus.gov)

**VOUCHERS FOR PAYMENT OF APPOINTED OR ASSIGNED COUNSEL:** Vouchers are sent to counsel appointed or assigned by the court in a separate transmission at the time judgment is entered. CJA 30 vouchers are sent to counsel in capital cases. CJA 20 vouchers are sent to counsel in criminal, post-judgment, habeas, and § 2255 cases. Assigned counsel vouchers are sent to counsel in civil, civil rights, and agency cases. Vouchers should be completed and returned within 60 days of the later of entry of judgment, denial of a petition for rehearing, or the grant or denial of a petition for writ of certiorari. If counsel appointed or assigned by the court did not receive a voucher, forms and instructions are available from the court's web site, www.ca4.uscourts.gov, or from the clerk's office.

**BILL OF COSTS:** A party to whom costs are allowable, who desires taxation of costs, shall file a Bill of Costs within 14 calendar days of entry of judgment. (FRAP 39, Loc. R. 39(b)).

**PETITION FOR REHEARING AND PETITION FOR REHEARING EN BANC:** A petition for rehearing must be filed within 14 calendar days after entry of judgment, except that in civil cases in which the United States or its officer or agency is a party, the petition must be filed within 45 days after entry of judgment. A petition for rehearing en banc must be filed within the same time limits and in the same document as the petition for rehearing and must be clearly identified in the title. The only grounds for an extension of time to file a petition for rehearing are the death or serious illness of counsel or a family member (or of a party or family member in pro se cases) or an extraordinary circumstance wholly beyond the control of counsel or a party proceeding without counsel.

Each case number to which the petition applies must be listed on the petition to identify the cases to which the petition applies and to avoid companion cases proceeding to mandate during the pendency of a petition for rehearing in the lead case. A timely filed petition for rehearing or petition for rehearing en banc stays the mandate and tolls the running of time for filing a petition for writ of certiorari.

A petition for rehearing must contain an introduction stating that, in counsel's judgment, one or more of the following situations exist: (1) a material factual or legal matter was overlooked; (2) a change in the law occurred after submission of the case and was overlooked; (3) the opinion conflicts with a decision of the U.S. Supreme Court, this court, or another court of appeals, and the conflict was not addressed; or (4) the case involves one or more questions of exceptional importance. A petition for rehearing, with or without a petition for rehearing en banc, may not exceed 15 pages. Copies are not required unless requested by the court. (FRAP 35 & 40, Loc. R. 40(c)).

**MANDATE:** In original proceedings before this court, there is no mandate. Unless the court shortens or extends the time, in all other cases, the mandate issues 7 days after the expiration of the time for filing a petition for rehearing. A timely petition for rehearing, petition for rehearing en banc, or motion to stay the mandate will stay issuance of the mandate. If the petition or motion is denied, the mandate will issue 7 days later. A motion to stay the mandate will ordinarily be denied, unless the motion presents a substantial question or otherwise sets forth good or probable cause for a stay. (FRAP 41, Loc. R. 41).

FILED: July 3, 2012

## UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

_____

No. 12-6757
(1:01-cr-00377-JFM-1)

_____

UNITED STATES OF AMERICA

       Plaintiff - Appellee

v.

NACOE RAY BROWN

       Defendant - Appellant

_____

## J U D G M E N T

_____

In accordance with the decision of this court, the judgment of the district court is affirmed.

This judgment shall take effect upon issuance of this court's mandate in accordance with Fed. R. App. P. 41.

/s/ PATRICIA S. CONNOR, CLERK